UNITED STATES of America,
Plaintiff–Appellee,

v.

Brett MUSCATELL, Lewis H. Bower,
Jr., Defendants–Appellants.

No. 93–3194.

United States Court of Appeals,
Eleventh Circuit.

Jan. 18, 1995.

628

Bennie Lazzara, Jr., Lazzara, Caskey and Paul, P.A., Tampa, FL, for Brett Muscatell.

Robert P. Polli, Tampa, FL, for Lewis H. Bower, Jr.

Robert A. Mosakowski, Tamra Phipps, Asst. U.S. Attys., Tampa, FL, for U.S.

Appeals from the United States District Court for the Middle District of Florida.

Before KRAVITCH and DUBINA, Circuit Judges, and GIBSON [1], Senior Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge:

Brett Muscatell and Lewis Bower appeal their convictions for multiple counts of conspiracy, fraud, and money-laundering in connection with a land flip scheme. We AFFIRM.

---

**1.** Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by desig-

## I. BACKGROUND

In the fall of 1988, Muscatell, a Tampa real estate broker, agreed to sell two separate groups of adjacent quadriplex rental units to John Rico, a self-employed maintenance worker. Rico needed financing in order to purchase the quadriplex units. Local lenders, however, required a downpayment of ten to thirty percent of the purchase price before financing such a purchase and limited commercial mortgages to eighty per cent of the lesser of either the appraised value of the property or its purchase price.

In order to obtain financing, Rico, Muscatell, Bower, a C.P.A., and John Slater, a local mortgage broker, engaged in a land flip scheme to artificially boost the real estate values and thereby increase the amount of financing available. Muscatell and Bower agreed for Bower's corporation, Palladino, to purchase the quadriplex units from the original owners. Palladino then resold them at a substantial markup to Rico through Muscatell, who acted as the real estate broker. As president of Palladino, Bower purchased each of the first four rental units (the North 15th properties) for $90,000.00 per unit and resold them to Rico for $160,000.00 per unit. Palladino purchased the second group of quadriplex units (the North 50th properties) for $85,000.00 each, and resold them to Rico for $163,000.00 each.

As a means of boosting the units' appraisal value to match the inflated purchase prices, Muscatell attempted to inflate the units' rental values by renegotiating new leases in which Palladino would pay tenants cash bonuses in order to offset large rental increases. These bonuses were not disclosed to the appraisers. Muscatell and Slater unsuccessfully offered several appraisers $500.00 per unit, double the going rate, as compensation in exchange for favorable appraisals. Muscatell also attempted to purchase additional documentary stamps on each sale of the second quadriplex units in order to make it appear to subsequent appraisers that Palladino had paid more for the property than it actually had.

nation.

In order to qualify Rico for financing, Muscatell instructed Slater to generate falsified income documentation for each purchase. This false income information was submitted on all eight loan applications, which were made to separate federally insured financial institutions in an attempt to conceal Rico's true income to debt ratio. The applications failed to disclose the fact that Rico was attempting to purchase additional rental units. Each application was submitted, pursuant to Muscatell's instructions, close enough in time to the others so that none of the lenders would learn of the other pending applications.

Muscatell, Bower, Slater, and Rico employed a complex buyer rebate scheme as a means of circumventing the downpayment requirement. Rather than disclosing the true source of Rico's downpayment income, Rico, Muscatell, and Bower generated false documentation in order to create the illusion that Rico was funding his own downpayment. After Rico received the required financing, he forwarded the funds to Bower. Bower's corporation, Palladino, then used these funds to pay the original owners of the rental units, to finance the rental subsidies, and to pay the remainder of Muscatell's commission. Muscatell's commission rates were over twenty-five percent of the inflated total sales price, well in excess of the standard commission rates of five to ten percent for these types of transactions. In total, Rico was able to borrow $1,001,000.00 to purchase eight quadriplex units from Palladino. Muscatell received total real estate commissions of $153,-000.00 above the amount rebated to Rico. Rico eventually defaulted on his mortgage payments, and the lenders foreclosed on the properties.

Muscatell and Bower were tried in federal district court under an eleven-count indictment. The government's witnesses included Allen Steinberg, a residential real estate appraiser who appraised the North 50th properties, and Valerie Jones, a former real estate purchaser involved with Muscatell and Bower in similar transactions. Slater and Rico also testified against Muscatell and Bower pursuant to plea agreements.

Steinberg's testimony related to the appraisal of another Tampa quadriplex that took place after the transactions charged in the indictment. Steinberg testified that sometime after he had completed his appraisals of the North 50th properties, Slater offered to hire him to appraise another quadriplex. Steinberg testified that he refused this second appraisal when his subsequent research revealed that comparable properties did not support the value suggested by Slater. Steinberg also testified that during the course of a May 1989 meeting with Slater and Muscatell, Muscatell offered Steinberg half of a $20,000.00 note in exchange for favorable appraisals on the aforementioned quadriplex properties.

Valerie Jones testified that in mid–1988, prior to the charged transactions, she had purchased several quadriplex units through a similar land flip scheme involving Bower, Muscatell, and Slater. Jones testified that she had formed a corporation, Sonrisa Bay Corporation, at the direction of and under the control of Bower in order to avoid the appearance that they were buying property from themselves. Jones also confessed to submitting fraudulent loan applications at the direction of Muscatell, who had instructed her not to list all of her rental properties on her loan application.

John Slater testified that he had represented other buyers in similar rebate schemes and land flip transactions both prior and subsequent to the charged transactions. In each transaction, Bower acted as the president of the flip corporation, either Palladino or Sonrisa Bay, and Muscatell acted as the real estate broker. In total, Slater testified that he and Muscatell had been involved in eleven similar rebate and land flip transactions for which Muscatell had not been indicted.

Slater also testified to several incriminating conversations that took place either before or after the charged transactions. Those conversations included a discussion in which Muscatell explained the necessity of not disclosing the rebates to the lending institutions because the rebate would be considered a reduction in the sale price. Slater testified about a conversation that took place

after the meeting with Steinberg. In that discussion, Muscatell stated that a new "flip corporation" was needed to create the impression that more people were involved in the transactions because Steinberg had figured out that they were "creating [their] own market for multi-family [rental units]." Slater also testified as to a conversation that took place between Muscatell and other prospective purchasers in which Muscatell explained the use of rent subsidies to artificially boost appraisal values.

The jury convicted Bower of conspiracy to commit bank fraud, conspiracy to commit wire fraud, and conspiracy to make false and fraudulent statements in matters within the jurisdiction of a federal agency, in violation of 18 U.S.C. § 371 (1988); wire fraud, in violation of 18 U.S.C. § 1343; three counts of bank fraud, in violation of 18 U.S.C. § 1344; two counts of making false and fraudulent statements in matters within the jurisdiction of a federal agency, in violation of 18 U.S.C. § 1001; and two counts of money-laundering, in violation of 18 U.S.C. § 1957. Muscatell was convicted on the same counts, plus an additional count for making false and fraudulent statements in matters within the jurisdiction of a federal agency. The district court sentenced Muscatell and Bower to thirty-six and twenty-four months imprisonment, respectively. Each was ordered to pay $680,827.00 in restitution. This appeal follows.

## II. DISCUSSION

### 1. Extrinsic Acts Evidence

The day before trial, the government notified the defendants in writing of its intent to introduce evidence pursuant to Fed.R.Evid. 404(b).[2] Muscatell and Bower claim that the district court abused its discretion by improperly admitting extrinsic bad act evidence against them in violation of 404(b). Specifically, they challenge the testimony of Steinberg, Jones, and Slater.

**2.** "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that

■ Determinations regarding the admissibility of evidence rest largely with the sound discretion of the trial court and will not be disturbed on appeal absent a clear showing of abuse of discretion. *United States v. Cardenas*, 895 F.2d 1338, 1342–43 (11th Cir.1990). The preliminary issue is whether the evidence in question is actually extrinsic evidence and therefore subject to 404(b) analysis. Evidence of criminal activity other than the charged offense is not extrinsic within the meaning of Rule 404(b) if it is an uncharged offense that arose out of the same transaction or series of transactions as the charged offense. *United States v. Weeks*, 716 F.2d 830, 832 (11th Cir.1983).

■ We believe that the challenged testimony was properly admissible as intrinsic evidence of the same series of transactions as the charged offenses. The charged offenses were not isolated acts, but rather, were part of a series of transactions involving the same principal actors, in the same roles, employing the same modus operandi. Each transaction involved the purchase of quadriplex residential rental property through a Bower-headed flip corporation, resale at inflated prices through Muscatell acting as the real estate broker and Slater acting as the mortgage broker, large nondisclosed buyer rebates, fraudulent loan applications, undisclosed rent subsidies, artificially inflated appraisals, and inflated sales commissions paid to Muscatell. The only variables seem to have been the location of the rental quadriplexes, the identity of the buyers, and the switch from Palladino to Sonrisa Bay as the flip corporation.

Muscatell and Bower argue that the challenged evidence is necessarily extrinsic because it occurred either prior to or subsequent to the charged offenses. We find the Fifth Circuit's decision in *United States v. Dula*, 989 F.2d 772 (5th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 172, 126 L.Ed.2d 131 (1993), instructive. In *Dula*, the

upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial." Fed.R.Evid. 404(b).

founder and the president of a corporation that supplied aerospace engineering materials were each indicted on charges of wire fraud, mail fraud, and false statements as part of an ongoing scheme to defraud their customers by substituting inferior products that failed to meet buyer specifications. The defendants objected to the testimony of a former employee regarding a prior uncharged transaction in which the corporation unsuccessfully attempted to pass nonconforming, inferior goods onto a buyer. *Id.* at 777. The court determined that the prior uncharged transaction was intrinsic evidence arising out of the same series of transactions as the charged offense.

> The defendants were charged with conducting a continuing scheme to defraud, characterized by the substitution of products, and it was necessary for the government to prove that the defendants had intentionally devised a scheme and artifice to defraud. In developing proof of intent and motive, the prosecution may offer all of the surrounding circumstances that were relevant.

*Id.*

In this case, Muscatell and Bower were charged with conducting a continuing scheme to defraud, characterized by land flip transactions, inflated appraisals, buyer-rebates, and fraudulent loan applications. Here, it was necessary for the government to prove that the defendants intentionally devised a scheme and artifice to defraud. "[O]ther transactions connected with the offenses charged have long been used to show a general pattern, the necessary criminal intent, or the guilty knowledge of the defendant." *Id.* Consequently, we conclude that the challenged testimony was intrinsic to the crimes charged. *See United States v. Montes–Cardenas,* 746 F.2d 771 (11th Cir.1984) (the importation of cocaine was intrinsic as part of the same series of transactions as the

charged offense of conspiracy to distribute cocaine).

We also reject Bower's and Muscatell's argument that the district court abused its discretion by failing to exclude the testimony of Steinberg, Jones, and Slater under Fed.R.Evid. 403[3]. The factors determining this analysis include "the strength of the government's case on the issue of intent, the overall similarity of the extrinsic and charged offenses, the amount of time separating the extrinsic and charged offenses and whether it appeared at the commencement of trial that the defendant would contest the issue of intent." *United States v. Dorsey,* 819 F.2d 1055, 1061 (11th Cir.1987), *cert. denied,* 486 U.S. 1025, 108 S.Ct. 2002, 100 L.Ed.2d 233 (1988). In this case, these factors favor admission of the challenged testimony. The element of criminal intent was arguably the weakest link in the government's case, and the focus of the defense. The extrinsic acts were extremely similar to the charged offenses. The amount of time separating the extrinsic and intrinsic acts was minimal, the extrinsic acts occurring mere months before and subsequent to the charged activity. Finally, both Muscatell and Bower made lack of criminal intent their primary defense from the outset of the trial. In sum, we do not believe that the potential prejudice of the challenged evidence substantially outweighed its probative value. We find no abuse of discretion under Fed.R.Evid. 403.

**2. Prosecutorial Comments**

Muscatell and Bower argue that the district court erred by failing to grant their motion for a mistrial based on allegedly improper prosecutorial comments on Bower's exercise of his Fifth Amendment privilege against self-incrimination.[4] The Fifth Amendment prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify. *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14

---

**3.** "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R.Evid. 403.

**4.** "No person ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const. amend. V.

**632**

L.Ed.2d 106 (1965). The standard for determining whether a prosecutor has impermissibly commented on a defendant's privilege against self-incrimination is "whether the statement was manifestly intended or was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Garcia*, 13 F.3d 1464, 1474 (11th Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 2723, 129 L.Ed.2d 847 (1994). The defendant bears the burden of establishing the existence of one of the two criteria. *Id.* We apply this test by examining the statements in their context in order to evaluate the prosecutor's motive behind the statements and in order to discern the impact of the statements. *Id.* The individual responsible for answering this question in the first instance is the trial judge, the only person who has the opportunity to observe the prosecutor's demeanor firsthand. *United States v. Watson*, 866 F.2d 381, 386 (11th Cir.1989). Consequently, we review the district court's denial of the motion for mistrial for abuse of discretion. *Id.*

We find no abuse of discretion. Viewed in the context in which they were made, we find that none of these statements improperly commented on Bower's exercise of his Fifth Amendment privilege against self-incrimination.

■ Two of the challenged statements are potentially troubling. The first challenged statement came toward the end of the government's closing argument when the prosecutor stated that the jury could not know whether or not Bower actually saw any false loan applications. Bower maintains that this statement referred to his failure to testify. The statement, when viewed in context, however, apparently refers to the law of conspiracy and the jury's ability to hold Bower vicariously liable for the acts of his co-conspirators. There is no reason why the jury would naturally interpret it as anything else.

■ The second allegedly improper comment occurred during the government's rebuttal, in which the prosecutor referred to what the defense had not proven and what the defense could not prove. Following an interruption from the court, the prosecutor retracted this statement, reiterated the fact that the burden of proof remained with the government, and explained that he had merely intended to tear holes in the defense's arguments. We believe that the prosecutor's subsequent explanation adequately clarified his statement as a reference to the defense's failure to counter evidence produced by the government as opposed to comments on the defendant's failure to testify. It is well-settled that such comments do not run afoul of the Fifth Amendment. *Watson*, 866 F.2d at 386.

The final two challenged statements are less egregious, and similarly cannot be reasonably viewed as comments on Bower's decision not to testify. Because we conclude that none of the challenged statements improperly referenced Bower's exercise of his privilege against self-incrimination, we conclude that the district court did not abuse its discretion by denying Bower's motion for mistrial.

### 3. Sufficiency of the Evidence

We review Bower's sufficiency of the evidence claim de novo as a question of law. *United States v. Hooshmand*, 931 F.2d 725, 733 (11th Cir.1991). The question is whether the evidence, viewed in the light most favorable to the government, was sufficient to establish the defendant's guilt beyond a reasonable doubt. *Id.* We note that the evidence need not be wholly inconsistent with every reasonable hypothesis other than guilt. *Id.* We have reviewed the record and conclude that the government produced sufficient evidence to convict Bower on each count beyond a reasonable doubt.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.