[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-10381

_____

D.C. Docket No. 1:12-cr-00297-TWT-ECS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CORA CADIA FORD,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(April 28, 2015)

Before MARCUS and ROSENBAUM, Circuit Judges, and FRIEDMAN,* District
Judge.

FRIEDMAN, District Judge:

_____

* Honorable Paul L. Friedman, United States District Judge for the District of Columbia, sitting
by designation.

Defendant Cora Cadia Ford, a tax professional, appeals from her conviction and sentence on ten counts each of mail fraud, making a false claim, and aggravated identity theft. After careful review, we affirm.

## I.  BACKGROUND

Cora Cadia Ford owned and managed a tax preparation business. Through that business, she operated a complex fraud scheme over a period of many years — acquiring personal information under false pretenses, often from victims who were homeless or mentally or physically disabled, and then using that information to file false tax returns and pocket the resulting refunds.

The evidence at the four-day trial was voluminous. The government called seventeen victims to testify. Eight corresponded to the fraudulent tax returns charged in the indictment (five as primary filers and three as dependents), while the remaining nine were victims of uncharged, but substantially similar, conduct.[1] All seventeen testified that they did not authorize Ford to use their personal information on fraudulent tax returns that either (1) were filed in their name, or (2) falsely claimed them as dependents. Each of those returns, however, listed Ford's name and business, "Genesis Tax Service," on the "paid preparer" line. Many of the returns also contained false addresses in common, such as "3353 Glenwood

---

[1] One government witness, Yvette Russell, was not a victim herself, but the sister of Jane Harris, a victim who was falsely claimed as a dependent. Ms. Russell testified that her sister is schizophrenic and had been living in a homeless shelter.

2

Road," the address of Ford's former tax preparation business, "Budget Tax Service." The refund checks for those returns either were deposited into Ford's bank account or cashed at a check cashing facility. The seventeen victims confirmed that they did not receive any portion of those refunds.

Seven victims of conduct charged in the indictment testified that they did not know how Ford had obtained their personal information and that they did not authorize Ford to file a tax return on their behalf. Only one of the victims of charged conduct — Sharon Fuller — was able to identify Ford. Similarly, four of the victims of uncharged conduct were able to identify Ford — Norman Ponder, Lisa Turner, Darryl Mitchell, and Mary Anne McGhee — while the remaining five could not.

Fuller, Ponder, Turner, Mitchell, and McGhee identified Ford in court and testified that she had obtained their personal information under false pretenses.[2] For example, Ms. Fuller testified that, while living in a homeless shelter, she saw an advertisement for a government program offering $200 for the homeless. She

---

[2] Ford sought to suppress four of these in-court identifications before trial, arguing that the out-of-court identification procedures used by the IRS agents were unduly suggestive. The magistrate judge heard testimony from some of the victims and an IRS special agent and concluded that the identifications were not unduly suggestive and were admissible. United States v. Ford, Criminal Action No. 1:12-CR-297-TWT-ECS, 2013 WL 1969876, at *3 (N.D. Ga. Apr. 8, 2013). His report and recommendation was adopted in full by the district court. United States v. Ford, Criminal Action No. 1:12-CR-297-TWT, 2013 WL 1966232, at *1 (N.D. Ga. May 10, 2013). The district court subsequently heard testimony from two additional victims and concluded that their identifications also were not unduly suggestive.

called the listed phone number and provided her name and social security number. Ms. Fuller then met Ford's husband to collect her $200 and met Ford herself at a church. Fuller testified that the employment information and addresses on the tax returns bearing her name were false and that she never received the refunds claimed on the returns.

The government also offered several other key pieces of evidence. First, four of Ford's personal income tax returns were admitted in evidence under Rule 404(b) of the Federal Rules of Evidence. One such return used a false address also listed on a victim's fraudulent tax return, while the others falsely listed a homeless man as Ford's dependent. Second, the government offered the testimony of a reporter for Fox 5 Atlanta and a redacted videotape of an investigative report.[3] That videotape showed Ford requesting the personal information of an undercover reporter, who was posing as homeless, and stating "[i]t's $200 and . . . I guess they started doing that for people who might be in need or that might be able to help them in some way." Third, an IRS special agent testified regarding summary charts that were admitted in evidence showing (1) the deposit of U.S. Treasury checks into Ford's bank account and (2) the tax returns prepared by Ford and her business.

The jury convicted Ford on all charges: ten counts of mail fraud, in violation

---

[3] The videotape was edited to remove the reporter's commentary and was limited only to Ford's statements and interactions with the reporters.

4

of 18 U.S.C. § 1341, ten counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A, and ten counts of filing a false claim, in violation of 18 U.S.C. § 287.  The district court sentenced Ford to 111 months of incarceration, followed by three years of supervised release; it also ordered the payment of $101,015 in restitution to the Internal Revenue Service and a special assessment of $3,000.

## II.  DISCUSSION

Ford makes numerous arguments on appeal, challenging both her conviction and sentence.  Ford argues that: (1) the district court erred in declining to suppress several out-of-court identifications as unduly suggestive; (2) counts in her indictment were multiplicitous and thus in violation of the Double Jeopardy Clause of the Fifth Amendment; (3) several pieces of evidence were improperly admitted under Rules 403 and 404(b) of the Federal Rules of Evidence; (4) the government's summary charts, admitted in evidence at trial, were irrelevant and contained impermissible hearsay; and (5) the district court erred in estimating the loss amount and number of victims for the purpose of enhancing her sentence. Each argument is addressed in turn.

### A.  Out-of-Court Identifications

Ford argues that the district court committed clear error in finding that the victims' pre-trial identifications of her were not unduly suggestive or unreliable. The denial of a motion to suppress is reviewed under a mixed standard.  We review

the district court's findings of fact for clear error and the application of law to those facts *de novo*. United States v. Beckles, 565 F.3d 832, 839 (11th Cir. 2009). We construe all facts in favor of the prevailing party, the government in this case, and may affirm the denial on any ground supported by the record. United States v. Caraballo, 595 F.3d 1214, 1222 (11th Cir. 2010).

We "employ a two-part test for determining whether an out-of-court identification was properly admitted." United States v. Brown, 441 F.3d 1330, 1350 (11th Cir. 2006). First, we determine "whether the original identification procedure was unduly suggestive." Id. If so, we then determine "whether, under the totality of the circumstances, 'the identification was nonetheless reliable.'" Id. (quoting United States v. Diaz, 248 F.3d 1065, 1102 (11th Cir. 2001)). Ford argues that the district court committed clear error because the pre-trial identifications fail both prongs. Her argument, however, falls short of the first hurdle — the photo array was unremarkable and there is no evidence that the interviewing agents suggested which photo to select.

A glance at the photo array readily undermines Ford's argument that the photo of her was notably different from the others. It was not. All six photographs are of African American women. Ford does not appear older than the other women; her photo is approximately the same size as the others; and her smile is not suggestive when women in two of the other photos also are smiling.

6

Testimony from the interviewing agents and witnesses also gives no indication that the procedure was suggestive. The agents did not point to any photo — they simply handed the witnesses the array, "and sat back and asked [them] did [they] recognize anyone." And the fact that one victim was shown Ford's individual photo *after* already having tentatively identified her is irrelevant. The district court therefore did not commit error, let alone clear error, in admitting the identifications.

## B. Multiplicity

An indictment is multiplicitous, and thus violates the Double Jeopardy Clause of the Fifth Amendment, "if it charges a single offense in more than one count." United States v. Williams, 527 F.3d 1235, 1241 (11th Cir. 2008). But, under the Supreme Court's test in Blockburger v. United States, 284 U.S. 299 (1932), an indictment is not multiplicitous if "each count requires an element of proof that the other counts do not require." Williams, 527 F.3d at 1241. Although we review multiplicity rulings for an abuse of discretion, we "actually conduct[] a legal analysis of the appellant's double jeopardy arguments which [i]s essentially *de novo*." United States v. Jones, 601 F.3d 1247, 1258 (11th Cir. 2010) (quoting United States v. Sirang, 70 F.3d 588, 595 (11th Cir. 1995)).

Ford argues that the ten counts of mail fraud under 18 U.S.C. § 1341 in the indictment are multiplicitous with the ten counts of false claims under 18 U.S.C.

§ 287. Each offense, however, requires proof of a distinct element. Mail fraud requires, among other elements, "the use of the mails in furtherance of the scheme." United States v. Sharpe, 438 F.3d 1257, 1263 (11th Cir. 2006) (quotation omitted); see 18 U.S.C. § 1341. Making a false claim does not. See 18 U.S.C. § 287. It instead demands, among other elements, that "the defendant made or presented a false, fictitious, or fraudulent claim to a department [or agency] of the United States." United States v. Slocum, 708 F.2d 587, 596 (11th Cir. 1983). The mail fraud statute has no such requirement. Because Section 1341 and Section 287 each demands proof of an element not required by the other, the mail fraud and false claims counts are not multiplicitous.

### C. Evidence Regarding Uncharged Offenses

Ford next argues that the district court improperly admitted evidence of uncharged offenses under Federal Rules of Evidence 403 and 404(b). We review the district court's decision to admit such evidence for an abuse of discretion. United States v. Bradberry, 466 F.3d 1249, 1253 (11th Cir. 2006) (per curiam).

Rule 404(b) of the Federal Rules of Evidence provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a [defendant]'s character in order to show that on a particular occasion the person acted in accordance with the character." Evidence of uncharged conduct is admissible, however, "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge,

8

identity, absence of mistake, or lack of accident."  FED. R. EVID. 404(b)(2).  Thus, for such evidence to be admissible under Rule 404(b),

> (1) it must be relevant to an issue other than defendant's character; (2) there must be sufficient proof to enable a jury to find by a preponderance of the evidence that the defendant committed the act(s) in question; and (3) the probative value of the evidence cannot be substantially outweighed by undue prejudice, and the evidence must satisfy Rule 403 [of the Federal Rules of Evidence].

United States v. Edouard, 485 F.3d 1324, 1344 (11th Cir. 2007) (citing United States v. Chavez, 204 F.3d 1305, 1317 (11th Cir. 2000)).

By contrast, evidence of such criminal conduct falls outside the scope of Rule 404(b), and thus is independently admissible, if it is "(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense[s], (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense[s]."  Id. (quoting United States v. Baker, 432 F.3d 1189, 1205 n.9 (11th Cir. 2005), abrogated on other grounds by Davis v. Washington, 547 U.S. 813, 821 (2006)). Whether offered under Rule 404(b) or as intrinsic evidence, the district court must find that the probative value of the proffered evidence is not substantially outweighed by unfair prejudice and that it meets the other requirements of Rule 403.  FED. R. EVID. 403; see Baker, 432 F.3d at 1205 & n.9.

Ford challenges three kinds of evidence offered by the government and admitted by the district court: (1) her personal income tax returns; (2) the

testimony of nine witnesses regarding related, but uncharged, criminal conduct; and (3) the videotape of the television news report.

### 1. Ford's Personal Income Tax Returns

Ford argues that her personal tax returns are relevant only to her character and thus were inadmissible under Rule 404(b). We disagree. The returns are directly relevant to proving the fraud scheme alleged by the government because they utilize the same methods as the charged conduct, and they demonstrate Ford's intent, identity, knowledge, and absence of mistake. The 2007 return, for example, listed Ford's address as 1248 Greenwich Street — the same false address listed on a victim's 2006 and 2007 tax returns — and it therefore is relevant both to knowledge and identity. And the 2009, 2010, and 2011 returns listed "Jack Fletcher" as her brother and dependent. Mr. Fletcher testified, however, that he was not related to Ford and was not her dependent. These returns therefore demonstrate Ford's intent and the absence of mistake. Because all four of Ford's personal income tax returns were relevant to issues other than her character, and there is no dispute that Ford filed these returns, the first two prongs for admission under Rule 404(b) were satisfied.

But Ford argues that the prejudicial effect of admitting her personal tax returns outweighs their probative value. The personal returns are highly probative, however, because they uniquely demonstrate Ford's intent, identity, knowledge,

10

and absence of mistake.  Her personal returns also directly tied her to the method of using false addresses and dependents, and evidenced her knowledge regarding one particular false address.  Moreover, the district court's contemporaneous limiting instruction when Ford's 2009, 2010, and 2011 personal tax returns were admitted in evidence cured "[a]ny possible unfair prejudice."  United States v. Spoerke, 568 F.3d 1236, 1251 (11th Cir. 2009).  The district court did not abuse its discretion in admitting the returns in evidence under Rule 404(b) of the Federal Rules of Evidence.

### 2.  Testimony of Victims of Uncharged Offenses

Seventeen alleged victims of Ford's fraud scheme testified at trial.  Only eight of those, however, were victims of the offenses charged in the indictment.  Ford argues that the district court abused its discretion in admitting the testimony of the remaining nine victims concerning tax returns Ford filed using their identities either as the taxpayer or, falsely, as a dependent on someone's return.  She maintains that this was impermissible under Rule 404(b) of the Federal Rules of Evidence.

Rule 404(b) is the wrong place to begin the analysis of this claim.  Our Circuit repeatedly has held that evidence of uncharged conduct that is part of the same scheme or series of transactions and uses the same *modus operandi* as the charged offenses is admissible as intrinsic evidence outside the scope of Rule

404(b).  See United States v. US Infrastructure, Inc., 576 F.3d 1195, 1210-11 (11th Cir. 2009) (such evidence admissible if it "is linked in time and circumstances with the charged crime and concerns the context, motive or setup of the crime; or forms an integral part of the crime; or is necessary to complete the story of the crime"); United States v. Muscatell, 42 F.3d 627, 630-31 (11th Cir. 1995) (testimony regarding uncharged conduct that was part of the same fraud scheme "was properly admissible as intrinsic evidence of the same series of transactions as the charged offenses" and was outside the scope of Rule 404(b)).  The testimony of the additional victims concerned fraudulent tax returns that were filed by Ford, during the same time period, and using the same methods.  For example, many of the returns contained false Schedule C information, like the returns charged in the indictment.  Others used the same common false addresses or false dependents — again, like the returns charged in the indictment.  And several of the victims also were homeless like at least one of the victims whose return was charged in the indictment.  Such testimony is probative evidence inextricably intertwined with the scheme charged in the indictment.  The district court therefore did not abuse its discretion.

### 3.  Television News Report

Ford argues that the undercover investigative report captured on videotape by Fox 5 Atlanta was improper character evidence and inadmissible under Rule

404(b) of the Federal Rules of Evidence.  At trial, the government alleged that Ford fraudulently obtained personal information and took advantage of homeless and other vulnerable individuals by claiming that she would obtain money for them from a government program.  See supra at 3-4.  The videotape shows Ford doing both.  See supra at 4.  It is therefore outside the scope of Rule 404(b) because it is part of the same "series of transactions" as, and also "inextricably intertwined" with, the charged offenses.  See Baker, 432 F.3d at 1218 (testimony regarding uncharged conduct in furtherance of same drug conspiracy charged in the indictment "clearly concerns an 'uncharged offense which arose out of the same transaction or series of transactions as the charged offense'" (citation omitted)); Muscatell, 42 F.3d at 630.[4]

In the alternative, Ford maintains that the news report is highly prejudicial and therefore should have been excluded under Rule 403 of the Federal Rules of Evidence.  While we agree that the "hidden camera" style of an investigative news report could, in some cases, be unduly prejudicial, the video shown to the jury in this case was heavily redacted.  All commentary from the reporter was removed and only the bare footage of the defendant's interaction with the undercover reporters was shown.  And any remaining prejudice from the stripped-down video was outweighed by the highly probative value of a videotape showing the

---

[4] This conclusion is underscored by the close proximity in time between the videotape, filmed in early 2007, and the charged offenses, which occurred between October 2007 and May 2011.

13

defendant engaging in nearly identical conduct as the charged offenses within the same time period. The district court therefore did not abuse its discretion in admitting the videotape.

### D. Summary Charts

"[S]ummary charts are to be used with caution, due to their potential for abuse." United States v. Richardson, 233 F.3d 1285, 1293 (11th Cir. 2000). Because Ford did not contemporaneously object to the admissibility of the summary charts on hearsay or relevancy grounds — the two grounds she now urges on appeal — we review her claim for plain error, rather than for an abuse of discretion. United States v. Olano, 507 U.S. 725, 731-32 (1993).[5] Under plain error review, Ford must show that: (1) the district court committed error; (2) the error was plain; and (3) the error affected her substantial rights. Id. at 732. Ford has failed to show that the district court committed plain error.

The two summary charts offered by the government summarized: (1) the IRS tax refunds that were deposited into Ford's bank account; and (2) the tax returns for 2010 listing Ford or her business on the "paid preparer" line. They do

---

[5] Ford argues that, by objecting generally to the chart's admission under Rule 1006 of the Federal Rules of Evidence, she implicitly objected on hearsay and relevancy grounds. But the district court clearly understood Ford's vague objection as concerning only whether the underlying documents were sufficiently "voluminous" under Rule 1006, asking the witness how many pages the records were and then stating "[w]ell, that's voluminous enough. Objection's overruled." See United States v. Zinn, 321 F.3d 1084, 1090 n.7 (11th Cir. 2003) ("It is a defendant's — or his counsel's — burden to articulate the specific nature of his objection . . . so that the district court may reasonably have an opportunity to consider it.").

14

not, as Ford claims, incorporate the testimony of witnesses who were not present at trial. Instead, the charts present bare facts pulled from Ford's bank account records and various tax returns — all of which were properly admitted in evidence as business records under Rule 803(6)(B) of the Federal Rules of Evidence. Ford's argument that the charts contain impermissible hearsay therefore is meritless.

As for the relevance of the summary charts, the charts were summaries of bank deposits and tax returns, some of which the government acknowledged at trial and here on appeal did not represent fraudulent activity. The government nevertheless argues that they were relevant to proving several aspects of Ford's scheme. The first chart demonstrated Ford's regular receipt of tax refunds from the IRS unassociated with her personal income tax refunds. The second showed the volume and regularity of tax returns prepared by her business. We conclude that even if error was committed in admitting the summary charts, the error was not plain, and — in view of the mountain of evidence supporting the jury's verdict — any error did not affect Ford's substantial rights.

### E. Sentencing

Ford argues that her sentence is procedurally unreasonable because the district court's calculation of the loss amount, resulting in an enhancement under U.S.S.G. § 2B1.1(b)(1)(H), and the number of victims, resulting in an enhancement under U.S.S.G. § 2B1.1(b)(2)(C), was not supported by sufficient

evidence.  Ford also argues that the district court erroneously defined "victim."

We review a district court's interpretation and application of the Sentencing Guidelines *de novo* but accept the court's factual findings unless they are clearly erroneous.  United States v. Cruz, 713 F.3d 600, 605 (11th Cir. 2013).  For a factual finding to be clearly erroneous, we must have a definite and firm conviction that a mistake has been made.  United States v. Rothenberg, 610 F.3d 621, 624 (11th Cir. 2010).

### 1.  Loss Amount

We review the district court's calculation of the loss amount, pursuant to U.S.S.G. § 2B1.1(b)(1), for clear error.  United States v. Barrington, 648 F.3d 1178, 1197 (11th Cir. 2011).  Although it may not speculate about the existence of facts and must base its estimate on reliable and specific evidence, the district court is required only to make a reasonable estimate of the loss.  Id.; see also U.S.S.G. § 2B1.1, Application Note 3(C) ("The court need only make a reasonable estimate of the loss."); United States v. Woodard, 459 F.3d 1078, 1087 (11th Cir. 2006) (per curiam) ("For sentencing purposes, the loss amount does not need to be precise and may only be a reasonable estimate of the loss based on the available information.").  And we give the estimate "appropriate deference."  U.S.S.G. § 2B1.1, Application Note 3(C) (citing 18 U.S.C. § 3742(e) and (f)).

The district court did not clearly err in finding that the government proved

16

by a preponderance of the evidence that the loss amount of Ford's offense was greater than $400,000. The court considered the evidence at trial, reviewed additional summary charts prepared by the IRS for sentencing, and heard the testimony of the IRS agent in charge of Ford's investigation. The IRS agent testified at sentencing that he reviewed all of the tax returns. Because many of the victims could not be located and interviewed, the agent narrowed the list of returns to just those that included common addresses — that is, those addresses that Ford listed repeatedly on different victims' tax returns that were under her control — a substantial indicator of fraud and a method used by Ford in her scheme. The agent interviewed as many victims as he could locate and visited each address and confirmed that it was highly unlikely that these addresses housed the individuals who were identified as residing there. The victims whom the agent located confirmed that their returns were indeed fraudulent. If these interviewed victims had not already been included in the loss calculation, they were then added. The "common address" returns, plus those returns confirmed to be fraudulent from victim interviews, totaled $500,501 in losses, after the agent excluded from his calculations over $400,000 in additional refunds claimed on returns filed by Ford that did not have common addresses.[6]

---

[6] The agent also excluded, out of an abundance of caution, returns that listed taxpayers and dependents with the same last names due to the possibility that the individuals were related and the return therefore could be legitimate.

17

Having heard this testimony and the trial testimony, and having reviewed the evidence, the district court reasonably concluded that the government had proven by a preponderance of the evidence that the "common address" returns were fraudulent and that the estimated amount of loss exceeded $400,000. There was no error.[7]

## 2. Number of Victims

Ford first argues that the IRS is the only victim in this case because the individual victims did not suffer pecuniary harm. See U.S.S.G. § 2B1.1, Application Note 1 (defining "victim," in part, as "any person who sustained any part of the actual loss determined under subsection (b)(1)"). Ford's interpretation is incorrect. Application Note 4(E)(ii) to Section 2B1.1 is clear that "any individual whose means of identification was used unlawfully or without authority" is a victim under U.S.S.G. § 2B1.1(b)(2). Our decision in United States v. Joseph, 743 F.3d 1350, 1351-52 (11th Cir. 2014) (per curiam), which Ford cites, is inapposite because it concerned restitution, not calculating enhancements under the sentencing guidelines.

---

[7] In support of her loss amount argument, Ford relies heavily on United States v. Rodriguez, 732 F.3d 1299 (11th Cir. 2013). But that case is inapposite. In Rodriguez, we determined that the district court had erred in applying a sentencing enhancement based on a summary chart because the government had "presented no witnesses to authenticate what the chart represented, how it was prepared, or by whom," and had failed to offer any "testimony or evidence tying the summary chart to any of the trial evidence." Id. at 1305. That is far from the case here. The IRS special agent's testimony provided an ample basis for the district court to find that the government had proven by a preponderance of the evidence that the sentencing enhancement under Section 2B1.1(b)(1) was warranted.

18

To the extent that Ford argues that Application Note 2 to Section 2B1.6 — which applies to convictions for aggravated identity theft under 18 U.S.C. § 1028A — bars a sentencing enhancement under Section 2B1.1(b)(2) for the number of victims, we disagree.    Section 2B1.6 only prohibits enhancing the sentence imposed on an underlying offense — here, mail fraud or false claims — based on a "specific offense characteristic for the transfer, possession, or use of a means of identification."    U.S.S.G. § 2B1.6, Application Note 2.    It does not prohibit sentence enhancements for offense characteristics unrelated to "the transfer, possession, or use of a means of identification."    See United States v. Cruz, 713 F.3d 600, 607-08 (11th Cir. 2013) (affirming application of Section 2B1.1(b)(10)(A)(i) use-of-device-making-equipment enhancements, which did not concern use of a means of identification, to offenses governed by Section 2B1.1, since plain language of Application Note 2 did not bar application of all "relevant conduct" enhancements).    For offenses governed by Section 2B1.1, like mail fraud and false claims, an enhancement is permitted under Section 2B1.1(b)(2) based on the number of victims, even where the indictment also charges aggravated identity theft.    See United States v. Manatau, 647 F.3d 1048, 1057 n.4 (10th Cir. 2011) (holding that "the number of victims is not [] an offense characteristic [relating to the transfer, possession, or use of a means of identification], and so the guidelines don't bar a separate enhancement based on [the number of victims]").    Section

19

2B1.6 therefore does not prohibit a sentence enhancement for the number of victims under Section 2B1.1(b)(2) for any non-aggravated identity theft offenses charged, such as mail fraud or making a false claim.

The district court also did not err by finding that the total number of victims had been proven by a preponderance of the evidence. The government's summary charts of tax returns bearing "common addresses" and the IRS agent's testimony concerning the method he used to determine that there were 354 separate victims — namely, that in doing his calculations he excluded duplicate names and names not connected to the fraudulent filing by either the common address method or direct interviews with witnesses — formed a sufficient and reliable basis for the district court to find by a preponderance of the evidence that the number of victims totaled more than 250.    See United States v. Washington, 714 F.3d 1358, 1361 (11th Cir. 2013) (the government "has the burden of introducing 'sufficient and reliable' evidence to prove the necessary facts by a preponderance of the evidence") (citations omitted).

## III.  CONCLUSION

For the foregoing reasons, defendant's conviction and sentence are AFFIRMED.

**CONVICTION AND SENTENCE AFFIRMED.**