[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-15584
Non-Argument Calendar

_____

D.C. Docket No. 8:17-cr-00174-JDW-MAP-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JASON JEROME SPRINGER,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(October 26, 2018)

Before TJOFLAT, WILLIAM PRYOR and HULL, Circuit Judges.

PER CURIAM:

Following a jury trial, Jason Jerome Springer appeals his convictions for

endeavoring to obstruct justice and attempting to tamper with witnesses.  Springer

argues that the district court abused its discretion by admitting evidence that he was a sympathizer of the Islamic State of Iraq and al-Sham ("ISIS"), a foreign terrorist organization. After careful review, we affirm.

## I. FACTUAL BACKGROUND

On November 11, 2016, Springer, a convicted felon, went to a shooting range with his wife, Tugba Tokatlioglu, and two friends, Garrett and Chastity[1] Cross. While there, Springer fired at least one of the three handguns the group had rented. As a result of these activities, on November 22, 2016, Springer was arrested, charged with being a felon in possession of a firearm, and transported to the Pinellas County Jail.

While incarcerated pending trial on the firearm charge, Springer talked about being a follower of ISIS, threatened to murder the district court judge assigned to his case, and instructed his wife to dissuade Garrett and Chastity Cross (who the government had subpoenaed) from testifying in his firearm case. We first outline Springer's comments about ISIS and threats to murder the district court judge, and then recount his conversations with Tokatlioglu about Garrett and Chastity Cross.

## A.    Comments about ISIS

While incarcerated, Springer told other inmates that he was "a follower of ISIS" and made various comments expressing his support for ISIS. For example,

---

[1]Ms. Cross is referred to in the record as both "Chasity" and "Chastity." For consistency, we call her "Chastity" throughout this opinion.

Springer told one inmate that he went to the shooting range to learn "how to shoot assault rifles and load clips because he was going to go on a mission" and needed to "learn how to shoot so he c[ould] go back to Jordan or Turkey . . . to teach [people] how to shoot." On another occasion, while watching news coverage of President Trump's travel ban,[2] Springer stated: "We everywhere, we already here, we already here so it doesn't matter about you got a travel ban, we already here." Springer reacted similarly to news of a shooting at the Fort Lauderdale airport, stating "see we here, we already here, we already here," and "it's only going to get worse[]."

Additionally, in a December 2016 phone call to his wife, Springer reacted excitedly to news coverage of an ISIS assassination, stating: "Uh-oh, there they go! They on TV. They on TV. . . . The boys with the black flags."[3]

## B.    Threats Against District Court Judge

Springer also talked to other inmates about murdering the district court judge assigned to his firearm case. Springer told inmate Michael Taylor that the judge was "too old" and "shouldn't be giving out all that time," and said he was "going to kill her because she['s] giving out all that time." Springer also described to Taylor how he planned to kill the judge, stating that "when he c[a]me back from

---

[2]President Trump's travel ban barred people from certain countries from entering the United States.

[3]The ISIS flag is black with white Arabic writing at the top and a white circle with black Arabic writing in the center.

3

Jordan he was going to know how to make a bomb out of [a] drone and he was going to run it into the courthouse where her office [was]." When Taylor asked Springer "what about if other inmates [are] in there," meaning the courthouse, Springer responded, "well that will be the sacrifice he'll be making to Allah." Springer also told Taylor that he "prayed every day that his judge would die." Taylor described Springer's demeanor when making these threats as serious, and stated that he did not think Springer was joking based on Springer's statements about being a follower of ISIS.

Springer also told inmate Traveous Anderson that he prayed every day for the district court judge to die. Springer described various plans for killing the judge to Anderson, stating that he would "bomb himself up and come in the courthouse and blow up," "figure out [the judge's] appointments, medical appointments, doctor appointments and stuff where he could get close to her to be able to do whatever he was going to do," or "have a drone rammed into her office."

In a similar vein, Springer told inmate Daniel White that he dreamed about killing the district court judge and wanted the judge to be killed. Springer also made a comment to White about a plan to "strap himself with bombs and if he runs out of ammunition, he will kill himself and kill everybody around him."

4

## C.    Attempts to Influence the Crosses' Testimony

Also during his incarceration, Springer instructed his wife, Tokatlioglu, to try to influence Garrett and Chastity Cross's testimony.  In an April 5, 2017 phone call, Tokatlioglu informed Springer that the government had subpoenaed Garrett and Chastity to testify against him in the firearm case.  Springer became angry and speculated that the Crosses reported him to law enforcement in the first place.  Springer further speculated that the government wanted the Crosses to testify that he used one of the rental guns at the shooting range, and instructed Tokatlioglu to "tell the [Crosses] that they don't know what kind of gun I had."

The next day, in another call, Springer told Tokatlioglu, "it's better for them not to even come . . . . [i]t's better for Garrett and them just to go ahead and go to jail."  Springer added: "[A]ll they [the Crosses] have to do is tell them [the government] that they not going to participate in this . . . and they . . . sit in jail for a couple—couple of months until this shit's over with."  Springer further instructed: "Tell'em if they [the Crosses]—if they come down here and they support these people [the government] they will then prosecute me then I'm—I'm screwed."  Springer reiterated: "[T]he next time you talk to him [Garrett Cross] . . . you tell him 'just to go ahead and arrest,' tell him to 'arrest me,' tell him to 'come lock me up and I'll sit in jail' and tell him sit in jail until this shits [sic] over with."

5

Tokatlioglu responded: "I told em . . . . I said [it would] be best if you guys don't go . . . . And I said if you do go, you know, . . . uh I told them what you said."

At trial, Garrett Cross testified that he told Tokatlioglu he was subpoenaed in the firearm case, but denied talking to her about the substance of his testimony. Garrett likewise denied that Tokatlioglu ever told him what to say or that he should not testify.

Chastity Cross also testified that she told Tokatlioglu she was subpoenaed to testify in Springer's firearm case, but said she did not talk to Tokatlioglu about the testimony she planned to give or what she would say. Tokatlioglu did, however, tell Chastity that she should not come and testify.

## II. PROCEDURAL HISTORY

### A.    Indictment

Based on his communications with his wife and the other inmates, a federal grand jury charged Springer with: (1) threatening to assault and murder a United States judge, in violation of 18 U.S.C. § 115(a)(1)(B); (2) endeavoring to obstruct justice, in violation of 18 U.S.C. §§ 1503 and 2; and (3) attempting to tamper with witnesses, in violation of 18 U.S.C. §§ 1512(b)(1) and 2. Springer pled not guilty and the case was set for trial.

6

**B.    Admission of ISIS-Related Evidence**

Prior to trial, the government filed a motion in limine to admit evidence of Springer's support for ISIS, including (1) the testimony of the three inmates identified above, (2) several images from Springer's cellphone, and (3) posts from Springer's Facebook page.  Specifically, the government sought to introduce the following cellphone and Facebook evidence:

(1) an image from Springer's cellphone depicting a man dressed in all black holding an assault rifle, with an ISIS insignia in the top corner and the captions: "Sometimes people with the worst pasts create the best futures"; and "Jihad is a purification no matter who you are or what sins you have, no good deeds are needed to come before it.  Don't let nothing hold you back.";

(2) an image from Springer's cellphone of the ISIS flag;

(3) an image from Springer's cellphone of Anwar al-Awlaki, a well-known Islamic extremist, with the caption: "People must bear in mind that in terms of the rule of law it is the law of Allah that is to be established";

(4) another image from Springer's cellphone of Anwar al-Awlaki, with the caption: " . . . And what I really fail to understand, is how can the martyr, the Shaheed, who willingly and happily hands over his soul to Allah, who walks towards his faith, with pleasure, and faces death with a smile, what I fail to understand is how can you call such a person a 'coward'!";

(5) a Facebook comment made by Springer, reading: "ISIS came out of the Iraqi army—Freedom fighters if anything";

(6) several Facebook status updates, including one that read: "The most important thing in life is to be prepared to DIE"; and another that read: "Death is the best teacher"; and

7

(7) a Facebook post containing a cropped version of the first cellphone photo, depicting a man in black holding an assault rifle.

The government argued this evidence was intrinsic to the offense charged in Count One (threatening a United States judge) and necessary to provide context and complete the story of the crime for the jury. Alternatively, the government argued the evidence was admissible under Federal Rule of Evidence 404(b) to show Springer's motive, intent, knowledge, and plan.

On the first day of trial, Springer, through counsel, objected to the introduction of all of the ISIS-related evidence, asserting that the evidence was irrelevant and unduly prejudicial. In response, the government reiterated the arguments made in its motion in limine. The district court overruled Springer's objections as to the admissibility of the inmate witnesses' proposed testimony, but reserved ruling on the admissibility of the cellphone and Facebook evidence. The district court determined that the testimony "provide[d] not only context [for Springer's threats] but motive, state of mind which the Jury can consider in determining whether they are true threats."

At trial, the three inmate witnesses—Taylor, Anderson, and White—testified about Springer's threats against the district court judge and statements about ISIS described in the factual background above. Following their testimony, the government sought to admit the cellphone and Facebook evidence, as well as the recorded call between Springer and his wife in which he expressed enthusiasm

8

about news of an ISIS assassination.  Springer, through counsel, objected that the evidence was irrelevant and unfairly prejudicial.  The government responded that this additional evidence corroborated the inmate witnesses' testimony and provided context for Springer's threats.  The district court overruled Springer's objection, concluding that though the evidence was "clearly inflammatory and prejudicial," it was probative of Springer's motives and the context in which his threats against the judge were made.

After the government admitted the additional ISIS-related evidence, the district court gave the jury a limiting instruction that the evidence was to be considered only for purposes of Count One and only to show motive and intent, as follows:

> You have just heard testimony and actually observed some exhibits related to what might be considered Defendant's sympathies for ISIS, a foreign terrorist organization.  You must treat this evidence with caution.  This evidence alone cannot be used to find the Defendant guilty of any of the offenses charged in the superseding indictment.  It may, however, be considered by you for limited purposes, such as considering the context in which statements attributed to the Defendant as alleged in Count One were made, what motive may have prompted the statement, whether he had the intent to retaliate and whether it is evidence of a plan, specifically whether or not as alleged in Count One he made a true threat in light of the other evidence that you will see and hear and have heard during the course of the trial.

The district court gave a similar limiting instruction regarding the ISIS evidence when it charged the jury before their deliberations.

9

## C.    Convictions and Sentences

The jury acquitted Springer on Count One, threatening a United States judge, but found him guilty on Counts Two and Three, endeavoring to obstruct justice and attempted witness tampering.

At sentencing, Springer had a total offense level of 18 and a criminal history category of III, resulting in an advisory guidelines range of 33 to 41 months' imprisonment. The district court sentenced Springer to 33 months' imprisonment on each count, to be served concurrently to each other but consecutive to the 27-month sentence already imposed in Springer's firearm case.[4]  Prior to this trial, Springer had pled guilty to the firearm charge.

## III. DISCUSSION

The sole issue on appeal is whether the district court abused its discretion in admitting the ISIS-related evidence and testimony at trial.[5]

## A.    Rules 404(b) and 403

Under Federal Rule of Evidence 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a

---

[4]On appeal, Springer does not challenge his guidelines calculations or the reasonableness of his sentences.

[5]We review a district court's evidentiary rulings for abuse of discretion. United States v. Troya, 733 F.3d 1125, 1131 (11th Cir. 2013). We will reverse an erroneous evidentiary ruling only if the resulting error was not harmless. United States v. Henderson, 409 F.3d 1293, 1300 (11th Cir. 2005). An error is harmless unless it had a substantial influence on the case's outcome or leaves a grave doubt as to whether the error affected the outcome. Id.

10

particular occasion the person acted in accordance with the character."
Fed. R. Evid. 404(b)(1).  Nevertheless, such evidence may be admissible to prove, among other things, motive, intent, preparation, plan, or knowledge.  Fed. R. Evid. 404(b)(2).  To be admissible, Rule 404(b) evidence must: (1) be relevant to an issue other than the defendant's character; (2) be supported by sufficient evidence to allow a jury to determine that the defendant committed the act; and (3) have probative value that is not substantially outweighed by undue prejudice and otherwise satisfy Federal Rule of Evidence 403.  United States v. Ford, 784 F.3d 1386, 1392-93 (11th Cir. 2015).

Separately, such other act evidence falls outside the scope of Rule 404(b), and thus is independently admissible, if it is "intrinsic" to the charged crime, meaning that it is inextricably intertwined with the evidence regarding the charged offense or is necessary to complete the story of the crime.  Id. at 1393; see also United States v. U.S. Infrastructure, Inc., 576 F.3d 1195, 1210 (11th Cir. 2009) (explaining evidence is intrinsic when it is "linked in time and circumstances with the charged crime and concerns the context, motive or setup of the crime; or forms an integral part of the crime; or is necessary to complete the story of the crime").  As with evidence offered under Rule 404(b), intrinsic evidence must meet the requirements of Rule 403.  Ford, 784 F.3d at 1393.

11

Under Rule 403, the district court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403.  In the criminal context, the term "unfair prejudice" refers to the capacity of concededly relevant evidence to "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." United States v. Horner, 853 F.3d 1201, 1213-14 (11th Cir. 2017).  A district court's Rule 403 balancing is entitled to deference, and we will reverse only where the district court's decision constitutes a clear abuse of discretion. United States v. Jernigan, 341 F.3d 1273, 1284-85 (11th Cir. 2003).  This is so because Rule 403 "is an extraordinary remedy that must be used sparingly." Horner, 853 F.3d at 1214 (internal quotations omitted).  Thus, in cases where we have found other acts evidence inextricably intertwined with the charged crimes, we have refused to find that the evidence nonetheless should have been excluded as unduly prejudicial under Rule 403. Id.

## B.    Analysis

Here, the district court did not abuse its discretion by admitting the ISIS-related evidence and testimony.  That evidence was necessary to provide context for and complete the story of the crime charged in Count One, threatening a United States Judge. See Ford, 784 F.3d at 1393; U.S. Infrastructure, 576 F.3d at 1210.  To prove that offense, the government had to show that Springer's threats

12

against the district court judge in his firearm case were "true threats"—i.e., "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals"—and not mere hyperbole. See Virginia v. Black, 538 U.S. 343, 359-60, 123 S. Ct. 1536, 1547-48 (2003) (providing that states, consistent with the First Amendment, may ban "true threats"); see also Watts v. United States, 394 U.S. 705, 708, 89 S. Ct. 1399, 1401 (1969) (per curiam) (interpreting statute criminalizing threats against the president to require the government to prove a true threat).

Taken out of context, Springer's outlandish threats to murder the district court judge by strapping a bomb to a drone and crashing it into her chambers could easily be viewed as nothing more than angry hyperbole. See Watts, 394 U.S. at 706, 708, 89 S. Ct. at 1401-02. But when viewed alongside the evidence of Springer's sympathies toward ISIS, it becomes far more plausible that Springer's threats were "a serious expression of an intent to commit an act of unlawful violence" against the district court judge. See Black, 538 U.S. at 359-60, 123 S. Ct. at 1547-48. Thus, the ISIS-related evidence was intrinsic to the crime charged in Count One, as it provided the jury with necessary context for Springer's threats and was relevant to prove an element of the offense. See Ford, 784 F.3d at 1393; U.S. Infrastructure, 576 F.3d at 1210.

13

Alternatively, even if the ISIS-related evidence was not intrinsic to Count One, it was admissible under Rule 404(b) to show Springer's motive, intent, plan, preparation, and knowledge. Fed. R. Evid 404(b)(2). The ISIS-related evidence helped to explain why Springer made the specific types of threats he did, how he planned to acquire the knowledge he would need to carry out such threats, and that his threats were serious. See, e.g., United States v. Lehder-Rivas, 955 F.2d 1510, 1518 (11th Cir. 1992) (evidence of defendant's views on Hitler and comparisons of his drug trafficking organization with the Third Reich, though prejudicial, was admissible because it was probative in proving defendant's motives and articulating the nature and scope of the conspiracy).

Additionally, whether considered as intrinsic evidence or under Rule 404(b), the district court did not abuse its discretion in determining that the probative value of the ISIS-related evidence was not substantially outweighed by undue prejudice. The potential prejudicial value of references to Springer's pro-ISIS sympathies is not lost upon us. But that evidence retains a sufficiently countervailing probative value given its importance in demonstrating Springer's statements were "true threats" and the unavailability of less prejudicial evidence to explain Springer's motives for making the specific kind of threats that he did. See id. at 1518; see also Horner, 853 F.3d at 1214.

14

Moreover, during trial the district court twice gave the jury limiting instructions regarding their consideration of the ISIS-related evidence, specifically cautioning them to consider it only as to Count One and only for the limited purposes of determining Springer's motive and intent and whether the threats were true threats.  See United States v. Edouard, 485 F.3d 1324, 1346 (11th Cir. 2007) (district court's limiting instruction mitigated any unfair prejudice possibly caused by admission of prior bad act evidence).  The district court was "uniquely situated" to make the nuanced, fact-specific judgments necessary to balance the probativeness of the ISIS-related evidence against its prejudicial value in this case, and we see no error in the district court's exercise of its discretion here.  See Jernigan, 341 F.3d at 1285.

Alternatively, even assuming arguendo that the district court erred in admitting the ISIS-related evidence, any such error was harmless. Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."); see also United States v. Henderson, 409 F.3d 1293, 1300 (11th Cir. 2005).  The ISIS-related evidence was admitted solely in connection with the threatening-a-judge charge in Count One, of which Springer was acquitted.  Accordingly, as to Count One, the ISIS-related evidence had no substantial influence on the outcome and did not affect Springer's

15

substantial rights.  United States v. Arbolaez, 450 F.3d 1283, 1290 (11th Cir. 2006).

Springer argues that the ISIS-related evidence may have influenced the jury's verdicts on Counts Two and Three.  But as noted above, the district court specifically instructed the jury, twice, that it was to consider the ISIS-related evidence only in connection with the offense charged in Count One, and we presume that the jury followed the district court's instruction.  United States v. Bowers, 811 F.3d 412, 422 (11th Cir. 2016).

Furthermore, ample evidence supports the jury's guilty verdicts on Counts Two and Three.  See Arbolaez, 450 F.3d at 1290.  Count Two charged Springer with endeavoring to obstruct justice in violation of 18 U.S.C. § 1503, which provides, among other things, that it is a crime to "corruptly . . . influence[], obstruct[], or impede, or endeavor[] to influence, obstruct, or impede, the due administration of justice."  18 U.S.C. § 1503(a).  Count Three charged Springer with attempting to tamper with the Crosses' testimony in violation of 18 U.S.C. § 1512(b), which, among other things, makes it a crime to "corruptly persuade[] another person . . . with intent to influence, delay, or prevent the testimony of any person in an official proceeding."  18 U.S.C. § 1512(b)(1).

Here, Springer was recorded on two separate occasions instructing his wife, Tokatlioglu, to tell Garrett and Chastity Cross either (1) to testify that they did not

16

know what kind of gun he used at the shooting range or (2) to not show up to testify at his firearm trial.  Tokatlioglu told Springer that she had done what he asked, and Chastity Cross admitted that Tokatlioglu asked her not to testify at Springer's firearm trial.  This evidence sufficiently demonstrates that Springer (1) corruptly endeavored to obstruct the administration of justice in his firearm case and (2) corruptly attempted to influence or prevent the Crosses' testimony.  See 18 U.S.C. §§ 1503(a), 1512(b)(1).  Though Garrett and Chastity both denied talking to Tokatlioglu about the substance of their testimony, and Garrett denied being told not to testify, the jury was free to discredit their testimony.  See United States v. Molina, 443 F.3d 824, 829 (11th Cir. 2006).  Moreover, the government was not required to prove that Springer's attempts to obstruct justice or tamper with the witnesses were successful.  See United States v. Davis, 854 F.3d 1276, 1292 (11th Cir. 2017) ("It is well established that a § 1503 offense is complete when one corruptly endeavors to obstruct or impede the due administration of justice; the prosecution need not prove that the due administration of justice was actually obstructed or impeded." (internal quotations omitted)).

## IV. CONCLUSION

For the foregoing reasons, we affirm Springer's obstruction of justice and witness tampering convictions.

**AFFIRMED.**

17