[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13018

_____

D.C. Docket No. 1:18-cr-20684-RNS-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TAMARA JEUNE,
a.k.a. Tamara Voltaire,

Defendant-Appellant.

_____

No. 19-14890

_____

D.C. Docket No. 1:18-cr-20684-RNS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TAMARA JEUNE,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(August 23, 2021)

Before MARTIN, ROSENBAUM, and LUCK, Circuit Judges.

PER CURIAM:

A jury convicted Defendant-Appellant Tamara Jeune of one count of conspiracy to defraud the government, in violation of 18 U.S.C. § 286, one count of filing false tax returns, in violation of 18 U.S.C. § 287, and three counts of assisting and advising in the preparation of false tax returns, in violation of 26 U.S.C. § 7206(2). Jeune now appeals her convictions, the $398,021 in restitution to the Internal Revenue Service ("IRS") that the district court ordered, and her sentence of 180 months of imprisonment.

After careful review and with the benefit of oral argument, we conclude that the evidence supports Jeune's convictions and calculated restitution amount, so we affirm in part. But we find clear error in the district court's imposition of a two-point enhancement for obstruction of justice, so we vacate Jeune's sentence and remand for resentencing.

# I.  BACKGROUND[1]

This appeal derives from conduct that occurred between January 19, 2011, and October 3, 2016.  But to put that conduct into context, we begin with background on Jeune's tax-preparation businesses, two of which are relevant to Jeune's appeal. We also review Jeune's 2009 tax-fraud conviction because the government used it in the presentation of its case at trial, and that fact underlies part of Jeune's claims on appeal.

## A.    2009 Tax Fraud Conviction

We start by emphasizing that Jeune was not indicted in the present case for the conduct we discuss in this section.  Nevertheless, because the district court authorized certain uses of and the government relied on the information we summarize below, and because Jeune's appellate challenges address that circumstance, we review Jeune's prior tax-preparation problems.

Since the early 2000s, Jeune has professionally prepared tax returns in South Florida.  Her first tax-preparation business, Accounting Advisors Group, operated out of Miami and Fort Pierce, Florida.  In 2005, Accounting Advisors Group was behind the preparation of thirty falsified individual tax returns for the 2004 calendar year.  On behalf of their unsuspecting clients, Jeune and her sister Dorothy prepared

---

[1] We take these facts from the evidence adduced at trial, which we view in the light most favorable to the government.  *See United States v. Calderon*, 127 F.3d 1314, 1324 (11th Cir. 1997).

and submitted individual income-tax returns supported by W-2s with altered withholding amounts and by 1040s with falsified deductions for substantial expenses. They filed these documents to generate larger tax refunds.

In 2009, Jeune was indicted on thirty counts of willfully assisting in the preparation of false tax returns in violation of 26 U.S.C. § 7206(2). She pled guilty that same year to one count of the indictment for her willful assistance in the preparation and submission of an individual income-tax return that included a W-2 with falsified wage-withholding amounts. The district court in that case sentenced Jeune to 18 months in prison to be followed by one year of supervised release.

It also imposed special conditions on Jeune's year of supervised release. As relevant here, Jeune had to obtain prior written approval from the court before entering any self-employment, and she could not operate, act as a consultant, or be employed in any tax-preparation-services business. After serving a reduced prison sentence of nine months, Jeune was released from custody, and her term of supervised release ran from February 10, 2010, until February 9, 2011.

## B.    Investment Equity Development, Inc.

The present tax-fraud charges arose from Jeune's tax-preparation business, Investment Equity Development, Incorporated, and another business that occupied the same building, Jacob G. Jeune, Professional Association, named after Jeune's son. On September 4, 2007, Jeune incorporated Investment Equity as a professional-

4

tax-preparation business located at 111 NW 183rd Street, Miami, Florida.  She listed herself as its registered agent and vice president and opened a SunTrust bank account under Investment Equity's name.  She also listed on at least three individual income-tax returns that her occupation was "office manager" and "bookkeeper" and that Investment Equity was her employer and tax preparer.

At some point, Investment Equity became inactive because of its failure to timely file the proper paperwork with the State of Florida.  But on May 6, 2009, Jeune filed paperwork to reinstate Investment Equity, listing the same mailing address and keeping her original titles as registered agent and vice president.  Only this time, Jeune identified Nicole Jeune as the director of Investment Equity.  Notably, Jeune reinstated Investment Equity just one week before she was sentenced for her 2009 tax-fraud conviction.

While Jeune was serving her sentence, the oddities at Investment Equity continued.  At the time, Investment Equity paid for a commercial-tax-preparation program provided by Drake Software.  Drake Software tracks the electronic transmission of tax returns by business, tax preparer, and electronic filing identification number ("EFIN"), which is necessary for business providers to be able to electronically file tax returns with the IRS.  During the nine months Jeune was incarcerated, Drake recorded at least 67 tax returns filed by someone from

Investment Equity using the EFIN 654945, a number Draft Software (incorrectly) associated with belonging to Jeune.

Drake Software also logs the calls that tax professionals make to its customer-support line. While Jeune was incarcerated, Drake Software's call logs indicate that 22 calls were made on behalf of Investment Equity by someone identifying as "Tamara" with the EFIN 654945. Adding further to the mystery, the EFIN 654945 actually belonged to Jeune's ex-husband, Louis Voltaire.

After Jeune completed her prison sentence, as we have mentioned, by the terms of her supervised release, she could not work at Investment Equity or any tax-preparation business during her one year supervised-release period, which ended on February 9, 2011. But Jeune faced another consequence of her 2009 tax-fraud conviction. As a recently convicted felon, she could not maintain or apply for an EFIN. That was so because an individual or person on behalf of a business must pass a criminal background check to obtain and maintain an EFIN and electronically file taxes with the IRS. In contrast, a preparer tax identification number ("PTIN"), which does not require a criminal background check, is used to identify individual professionals who prepare IRS tax returns or claims for refund. But EFIN holders are the only ones authorized to transmit tax returns through the IRS's electronic filing system.

6

So after her release from prison, Jeune could serve in only a limited capacity with Investment Equity. According to her 2011 tax return, she returned to Investment Equity as an "office manager" earning an annual salary of $67,000.

## C.    IRS Civil and Criminal Investigations

### 1.    2011 IRS Civil Audit of IED

About six months after Jeune's completion of her supervised-release period, trouble hit Investment Equity. In August 2011, the IRS began a civil audit of the firm for its delinquent business and corporate tax filings. The investigation originated in New York because Jeune's uncle, Lionnel Meronne, lived there and was listed as Investment Equity's president in its 2011 articles of incorporation. But Meronne informed the IRS that he did not prepare taxes or own Investment Equity located in Florida; his niece Jeune did.

So Florida-based IRS Auditor Ava-Marie Schmergel audited Investment Equity to verify the accuracy of business tax returns, collect money owed for tax liabilities, and impose any civil penalties. As Investment Equity's registered agent, Jeune initially responded on the company's behalf to the IRS's civil audit inquiries and request for documents.[2]

---

[2] Between 2009 and 2011, Jeune signed on behalf of Investment Equity for corporate and partnership income-tax returns. On corporate tax returns, she listed herself and her uncle as the "corporate representatives" of Investment Equity. On partnership income-tax returns, she listed herself as a "domestic partner" of Investment Equity.

During a phone call with Schmergel, Jeune explained that she managed and ran Investment Equity's business, which prepared on average 200 tax returns per year. She stated that the business was a partnership in which she split ownership with her uncle Meronne. She also falsely claimed that she already provided the delinquent employment and income-tax returns to the IRS, but the IRS had proof that she had not.

Schmergel soon uncovered tax returns indicating that Jeune's ex-husband Voltaire worked as a tax preparer and obtained an EFIN to electronically file taxes at Investment Equity.[3] Schmergel spoke with Jeune and Voltaire by phone to ask about the daily operations of the business, such as how fees were charged, who prepared the tax returns, how returns were prepared, and the type of tax-preparation software used. Over the course of these conversations, the explanations about Voltaire's and Jeune's roles at Investment Equity were inconsistent and contradictory.

For instance, in January 2012, Voltaire spoke with Schmergel by phone and stated that he did not prepare any tax returns. A few days later, during another phone call, Voltaire changed his mind, claiming that he misunderstood Schmergel's initial questions and that he did in fact prepare tax returns at Investment Equity. When

---

[3] Voltaire and Jeune formally divorced on July 22, 2011, though they had been separated for years before that.

Schmergel followed up on his involvement, Voltaire could not answer basic questions, such as Investment Equity's physical address, the digits of the EFIN and PTIN assigned to his name, and the type of tax-preparation software he used.

Schmergel then met with Voltaire and Jeune at Investment Equity's office, and both continued to maintain that Voltaire prepared tax returns for the business. They even signed affidavits attesting that Voltaire prepared tax-returns, ran the day-to-day operations, and accessed Investment Equity's bank accounts. But as the interview progressed, Voltaire could provide only surface-level responses to the IRS auditors' technical questions about Investment Equity's operations and tax-preparation procedures. Although Jeune attempted to jump in and answer on Voltaire's behalf, the auditors intervened and insisted that Voltaire answer. He could not. Perhaps the strongest indication that Voltaire couldn't have professionally prepared tax returns for others was his admission to not reporting on his tax returns substantial cash payments he received from Investment Equity.

The stories changed again, and Jeune finally admitted that she and her sister had prepared and transmitted tax returns at Investment Equity, and Voltaire had not prepared any returns. Jeune also revealed that many of her family members worked

9

for her at Investment Equity.[4]  She claimed her brother George prepared taxes, even though none of the documents indicated that he did.

After Schmergel informed Jeune and Voltaire about the consequences of committing perjury, Jeune prepared new affidavits for herself and Voltaire reflecting their true roles at Investment Equity, and they respectively signed them under penalty of perjury.  Voltaire and Jeune stated in these affidavits that "MOST OF THE PAPER WORK DAY TO DAY . . . IS HAND[]LED BY . . . TAMARA JEUNE," in response to the question, "WHO RUNS BUSINESS DAY-TO-DAY?" They also both attested that Jeune had access to the business's bank accounts from 2008 through the "PRESENT," as of the date of the affidavits (February 8, 2012).

Schmergel also subpoenaed Investment Equity's bank records, obtained tax documents filed by employees, reviewed EFINs and PTINs associated with the business, and cross-checked Information Returns Processing ("IRP") System data, which is based on employers' reporting of taxpayer income and wages, against the IRS's internal databases, which are based on individual employees' reported wages and earnings.

Bank records revealed that Meronne and Jeune, as president and vice president, were authorized signers on Investment Equity's SunTrust bank accounts

---

[4] Later, when asked for Investment Equity's payroll documents, Jeune listed nine or ten employees.  That list included her brother George, her sister Dorothy, her mother Marie, and her uncle Meronne.

ending in "2027" and "1730."  Most of the checks withdrawn from the account bore what appeared to be Jeune's signature.  Schmergel also noticed that a substantial number of deposits into the bank accounts were labeled as "U.S. Treasury tax refunds" and included taxpayer names and Social Security numbers that did not belong to Meronne or Jeune.

To determine Investment Equity's true net income for business-tax liability, Schmergel performed a reconciliation of the Investment Equity bank records to reconcile the income coming in and the withdrawals going out.  She learned that about a third of the total IRS tax refund amount deposited in 2009 was never redistributed to Investment Equity's taxpayer clients that year, and two-thirds of the total IRS tax refund amount deposited in 2010 was never redistributed to taxpayer clients that year.  Jeune could not provide Investment Equity's receipts, invoices, and proof of distributed IRS refunds.

Schmergel also reviewed a list of EFINS and PTINS associated with Investment Equity.  The EFIN holders all were within Jeune's inner circle—her ex-husband Voltaire, her then-boyfriend Seymour Gordon, and her son Jacob.  Voltaire admitted that he obtained an EFIN and PFIN for Jeune's use.

Because of EFIN misuse, Schmergel requested that the IRS terminate Voltaire's EFIN on February 2, 2012.  Soon after, Jeune called the IRS requesting that the EFIN be reinstated, but she was told to contact Schmergel directly.  So

11

Voltaire called Schmergel and stated that he prepared tax returns, and he wanted his EFIN to be reinstated. After Voltaire had no luck, Jeune then called Schmergel to ask that she reinstate Voltaire's EFIN. She declined.

But that did not end Investment Equity's filing of tax returns. During a visit to Investment Equity, Schmergel observed Jeune's then-boyfriend Gordon applying for an EFIN on a computer. On a later visit, Schmergel noted that Gordon successfully obtained an EFIN. But taped to an office wall was a 2012 tax-product training certificate listing *Jeune*'s name and Gordon's EFIN. Schmergel informed the IRS about the misuse of Gordon's EFIN, and the IRS terminated it on September 7, 2012. Schmergel also observed in plain view on office desks at Investment Equity W-2s for 2010 and 2011 listing several company names, such as Steven and Steven Electric, Nickourts International, Chef Creole Cuisine, and Omass Transportation. These company names became significant in the criminal investigation, discussed below.

At the conclusion of the audit in the summer of 2012, Gordon and Jeune were fined $30,000 for allowing U.S. Treasury checks to be deposited directly into Investment Equity's bank account instead of taxpayer bank accounts. Schmergel then recommended to her advisers that Investment Equity be referred to the IRS criminal-investigation division.

2.    <u>2012 IRS Criminal Investigation</u>

12

In July 2012, Special Agent John Bates was assigned to lead the IRS criminal investigation of Investment Equity. Bates interviewed Jeune, and she admitted to preparing fifty tax returns at Investment Equity while she was on supervised release for her 2009 tax-fraud conviction. In a separate interview, Voltaire also conceded to Bates that he lied during the civil audit and admitted to not preparing tax returns at Investment Equity.

## D.    Present Criminal Charge

In August 2018, a grand jury charged Jeune with one count of conspiracy to defraud the government, 18 U.S.C. § 286, four counts of filing false, fictitious, or fraudulent claims, 18 U.S.C. § 287, and five counts of aiding or assisting in the filing of false tax returns, 26 U.S.C. § 7206(2). The charges stemmed from tax returns prepared and filed between January 19, 2011, and October 3, 2016.

Jeune entered a plea of not guilty and stood trial. The government noted that Jeune could not obtain an EFIN because of her status as a convicted tax-fraud felon. So, the government asserted, Jeune ran Investment Equity and Jacob Jeune, P.A., as her tax-preparation businesses, employed her inner circle of family and friends, acquired EFINs in some of their names, and continued to prepare and transmit falsified tax returns to the IRS using those EFINs.

A recurring pattern emerged in the present tax-fraud scheme: W-2s were falsified using the same fake businesses, tax deductions were inflated, and individual

13

tax returns claimed substantial business expenses for vehicles and medical and dental expenses.  Tax refunds funneled into Investment Equity bank accounts that Jeune controlled, and sometimes only a portion or none of the refund went to the taxpayer.  Although Jeune admitted that tax fraud occurred at Investment Equity, she insisted that other employees had filed the falsified tax returns and controlled the bank accounts with IRS refund money.

After a five-day presentation of evidence and before jury deliberations, Jeune moved for acquittal, which the district court granted in part.  It dismissed five of the ten charges listed in the indictment.  The jury found Jeune guilty of the remaining five charges—one count of conspiracy to defraud the government, in violation of 18 U.S.C. § 286 (Count 1); one count of filing false tax returns, in violation of 18 U.S.C. § 287 (Count 4); and three counts of assisting and advising in the preparation of false tax returns, in violation of 26 U.S.C. § 7206(2) (Counts 6, 8, and 10).

Following sentencing and restitution hearings, the district court sentenced Jeune to a total of 180 months' imprisonment and ordered her to pay $398,021 in restitution to the IRS.  Jeune now appeals her convictions, sentence, and restitution amount.

## II.  DISCUSSION

On appeal, Jeune seeks to reverse her convictions based on evidentiary challenges or, alternatively, to vacate her sentence and remand for a reduced

sentence. She makes a total of nine challenges on appeal, and we separate them into three sections below. First, in Part A, we discuss Jeune's two evidentiary challenges to the government's use of her prior tax-fraud conviction and to the sufficiency of evidence used to convict her on all counts. Second, in Part B, we address her single challenge to the method used to calculate the restitution amount owed. And third, in Part C, we review her five sentencing challenges to Guidelines enhancements and her argument that her sentence was procedurally and substantively unreasonable.

## A.    Evidentiary Challenges

Jeune challenges the admission of her prior tax-fraud conviction under Federal Rule of Evidence 404(b). She contends that the government capitalized on the district court's Rule 404(b) ruling to introduce superfluous and damaging details about the underlying facts of her prior conviction and to unfairly characterize her as a serial tax fraudster. And, Jeune asserts, the probative value of this unnecessary evidence, which she argues should have included only the prior conviction's bare judgment, did not substantially outweigh its prejudicial effect on the jury.

Jeune also argues that the government did not provide sufficient evidence to convict her on all counts. Instead, she urges, by misusing her prior conviction, the government created a scrambled timeline of her 2009 conviction, Investment Equity's IRS audit and criminal investigation, and her underlying conduct for the

15

charged offenses to confuse the jury into convicting her for her criminal past. We address these contentions in turn.

1.    Rule 404(b)

We review evidentiary challenges for "a clear abuse of discretion." *United States v. McNair,* 605 F.3d 1152, 1203 n.69 (11th Cir. 2010) (quoting *United States v. US Infrastructure, Inc.*, 576 F.3d 1195, 1208 (11th Cir. 2009)).

Prior to trial, the government filed a motion *in limine* to allow the introduction of Jeune's 2009 tax-fraud conviction and the facts underlying that conviction under Rule 404(b) of the Federal Rules of Evidence. It also sought a ruling authorizing the government to use the fact that Jeune was on supervised release from her 2009 conviction and was prohibited from engaging in the tax-preparation business when she allegedly executed the scheme at issue here.

The district court held a hearing and initially ruled that the evidence was admissible to prove intent and motive under Rule 404(b) and was "inextricably intertwined" with Jeune's continued operation of a tax-preparation business as a fraudulent scheme. Before closing arguments, upon revisiting the evidentiary ruling after renewed objections, the district court clarified that the 2009 conviction and supervised-release violation were admissible for only intent or motive purposes under Rule 404(b), and the court determined the evidence was not, in fact, "inextricably intertwined."

16

Federal Rule of Evidence 404(b) prohibits using evidence of other crimes to show that the defendant "acted in accordance" with her alleged bad character. Fed. R. Evid. 404(b)(1). But evidence of other crimes may be admissible for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(1)-(2).

For evidence of a prior conviction to be admissible under Rule 404(b), "a prior act (1) must be relevant to an issue other than defendant's character, (2) must be sufficiently proven to permit a jury determination that the defendant committed the act, (3) must have probative value that is not substantially outweighed by undue prejudice, and (4) must otherwise satisfy Federal Rule of Evidence 403." *United States v. Nerey*, 877 F.3d 956, 974 (11th Cir. 2017). Jeune's challenges on appeal relate to only the first and third parts of this test.

At trial, the government used Jeune's prior conviction in several ways. It relied on it in both its opening and closing statements, and it entered it into evidence through the redacted change-of-plea and sentencing transcripts and the testimony of retired IRS Agent Andrew Schmidt and Probation Officer Randel Frimet.

### a. *Redacted Hearing Transcripts and Witness Testimonies*

We begin with a review of the 404(b) evidence introduced into the record through witnesses and consider whether that evidence was relevant to an issue other

than Jeune's character. *Nerey*, 877 F.3d at 974. Evidence is relevant if it tends to make a fact more or less probable than in the absence of that evidence, and that fact is consequential in determining the action. Fed. R. Evid. 401.

Jeune argues that the 404(b) evidence should have been limited to her 2009 guilty plea to one count of willfully assisting in the preparation of false tax returns in violation of 26 U.S.C. § 7206(2). She maintains that any other evidence—including the 2009 indictment with thirty counts for willful assistance in the preparation of false tax returns, the factual proffer of her plea deal, Probation Officer Fremit's testimony concerning her sentence and terms of supervisory release, and IRS Agent Schmidt's reading into evidence of the plea transcript—was entirely irrelevant. Instead, she contends, the government introduced this evidence solely to demonstrate Jeune's alleged criminal propensity to commit tax fraud. The government denies the improper purpose and asserts that the identified evidence was admissible under Rule 404(b)(2) to prove motive, intent, preparation, and absence of mistake.

We agree with the government. Because Jeune entered a "not guilty plea," "intent" was "a material issue." *United States v. Delgado*, 56 F.3d 1357, 1365 (11th Cir. 1995). To meet the "substantial burden" to prove intent, the government may rely on "qualifying 404(b) evidence absent affirmative steps by the defendant to remove intent as an issue." *Id.*; *see also United States v. Edouard,* 485 F.3d 1324,

1345 (11th Cir. 2007). Jeune was charged with substantive crimes that include a knowledge or willfulness element, 18 U.S.C. § 287 and 26 U.S.C. §7206(2). She was also charged with conspiracy to defraud the government with respect to claims, 18 U.S.C. § 286. We have recognized that conspiracy, in particular, involves a "special difficulty of proving intent." *United States v. Pollock,* 926 F.2d 1044, 1048 (11th Cir. 1991).

In seeking to introduce the prior-acts evidence, the government acknowledged that "while there is overwhelming evidence of fraud in this case," "what is not overwhelming in this case is evidence that this defendant was the one who did it." So the details concerning Jeune's prior conviction, sentence, and alleged violation of supervised release helped explain the government's theory that Jeune had used her inner circle of family and friends to obtain EFINs (allowing her to continue to stealthily prepare and file tax returns) because she was not permitted to do so in her own right.

And her reinstatement of Investment Equity as a business just days before her 2009 sentencing hearing was likewise relevant to her intent and knowledge. Indeed, Jeune admitted that tax fraud occurred at Investment Equity, but she blamed other employees and claimed no involvement in the tax-fraud scheme. To rebut this, it was fair for the government to rely on the underlying facts of her 2009 tax fraud conviction to prove identity and knowledge of the scheme. And Jeune's testimony

19

at her 2009 plea hearing that she made "a mistake" from which she could "learn" went to the absence of a mistake here.

The 2009 tax-fraud scheme and the instant charges also have striking similarities. Both schemes involved inflated tax deductions for medical and business expenses as well as falsified W-2s listing businesses with unique names like Nickourts International Inc., Steven and Steven Electric Inc., and Omass Transportation, Inc. We have found these types of similarities to be directly relevant to showing intent, identity, knowledge, and absence of mistake in tax-fraud schemes. *See*, *e.g.*, *United States v. Ford*, 784 F.3d 1386, 1393 (11th Cir. 2015). In sum, the 2009 conviction and its facts, including the supervised-release violation, as introduced through the witnesses and redacted transcripts, were relevant under Rule 404(b) to show intent, identity, knowledge, and absence of mistake.

Next, we consider whether the evidence's probative value was substantially outweighed by any undue prejudicial effect and whether it otherwise satisfied Federal Rule of Evidence 403. *Nerey*, 877 F.3d at 974. We conclude the evidence passes muster under these tests as well. We have stated that Rule 403 "should be used only sparingly" and that we must "look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *United States v. Smith,* 459 F.3d 1276, 1295 (11th Cir. 2006) (citations and internal quotation marks omitted); *United States v. Alfaro-Moncada*,

20

607 F.3d 720, 734 (11th Cir. 2010) (describing the exclusion of relevant evidence under Rule 403 as "an extraordinary remedy").

Jeune argues that the government should not have been permitted to get into the details of her prior conviction because it was not necessary, in light of the government's evidence, which included 150 fraudulent tax returns filed at Investment Equity, as well as testimony from nine victims, three IRS employees, Jeune's ex-husband, and a probation officer. Instead, she contends, the government should have simply relied on the 2009 criminal judgment. In her view, doing so would have yielded the same probative value without the allegedly unfair prejudice. In support of her argument, Jeune cites to *Old Chief v. United States,* 519 U.S. 172 (1997).

Jeune's arguments fall short for several reasons. For one, *Old Chief* did not involve Rule 404(b) evidence. There, the defendant's status as a convicted felon was at issue, and he sought to concede he was a convicted felon and limit the government to that fact, rather than allowing the government to introduce evidence of the nature and details of the prior conviction. *Id.* at 175. The government refused to join Old Chief's requested stipulation, and the district court concluded it did not have to do so. *Id.* at 177. The Court held that "when proof of convict status is at issue," it is an abuse of discretion to admit a defendant's record of a prior conviction when the defendant is willing to stipulate to the status. *Id.* at 192.

21

But the Court was careful to limit its ruling to "when the record of conviction would not be admissible for any purpose beyond proving status, so that excluding it would not deprive the prosecution of evidence with multiple utility." *Id.* at 190. Indeed, the Court expressly noted that "if . . . there were a justification for receiving evidence of the nature of prior acts on some issue other than status (*i.e.* [for a Rule 404(b) purpose]), Rule 404(b) guarantees the opportunity to seek its admission." *Id.* Here, though, Jeune's status as a prior convict was not an element of the offense, and, as we have explained, the challenged evidence was relevant to intent, identity, knowledge, and absence of mistake.

And Rule 403 creates "no requirement that the government choose the least prejudicial method of proving its case." *United States v. Dixon*, 698 F.2d 445, 446 (11th Cir. 1983). Nor is it meant to "sanitize[ ]" the facts or "to mitigate a crime." *United States v. McRae,* 593 F.2d 700, 707 (5th Cir. 1979).[5]

In other words, the government was not limited to introducing only the prior judgment of conviction. Indeed, introducing only the 2009 judgment would not have allowed the government to establish the similarities between the 2009 scheme and the charged scheme. It wouldn't have permitted the government to show that the same company names were used on the false W-2s, the same process was used of

[5] Decisions of the Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

claiming fraudulent refunds and not providing the entirety of some refunds to the taxpayer, and Jeune's inner-circle members participated in both schemes. All these facts went to prove identity, intent, lack of mistake, knowledge, and *modus operandi*. For those reasons, all were permissible—in fact, contemplated—Rule 404(b) uses. And while the government should not have relied on the evidence that she had been charged in 2009 in 30 counts, the scope of the scheme—which would have nonetheless covered at least those thirty counts—was admissible under Rule 404(b) as evidence of identity, intent, knowledge, lack of mistake, and *modus operandi*.

The Dissent also takes issue with the mention of Jeune's "pray[er]" for "mercy" at the sentencing hearing for her prior conviction. But the entirety of Jeune's statement that the government entered into evidence was this: "I pray that you show me favor and mercy. I'm very sorry, *but it was a mistake*." Jeune's explicit acknowledgement of her mistake in the prior conviction was admissible to show Jeune's absence of mistake or accident in committing the underlying conduct for the instant offenses. For that reason, it was not improper or unfair of the government to rely on it under Rule 404(b).

As for Jeune's prison time, the defense pointed to that to argue that Jeune could not have been involved in the charged offenses since fraud occurred while she was in jail. True, the specific fact that the sentence imposed was eighteen months was not relevant and should not have been mentioned. After all, Jeune did not spend

23

eighteen months in prison, so that detail was not relevant to anything. But that she was sentenced to eighteen months was not significantly more prejudicial to Jenue than the fact that she actually spent nine months in prison—a fact that, as we have noted, she emphasized as an alibi.

Plus, the district court's instructions to the jury appropriately mitigated any possible unfair prejudice arising from the government's presentation of the challenged evidence. Before the testimony of Agent Schmidt and Probation Officer Femit, closing arguments, and jury deliberations, the district court instructed the jury to consider Jeune's 2009 conviction for only the "limited purpose" of assisting the jury's determination of whether Jeune had a motive, opportunity, or plan or the state of mind necessary to commit the charged offenses. We presume juries follow the judge's instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *see also In re Price,* 964 F.3d 1045, 1049 (11th Cir. 2020) (describing this presumption as "rock solid law enshrined in a host of decisions of the Supreme Court and this Court"). Ultimately, we conclude that the probative value of the challenged evidence was not substantially outweighed by any unfair prejudice.

Because all parts of the Rule 404(b) test are satisfied, we find no abuse of discretion in the district court's admission of evidence of the 2009 tax-fraud conviction. *Ford*, 784 F.3d at 1393-94.

b. *Opening and Closing Statements*

24

Jeune also objects to some of the government's use of the challenged evidence in opening and closing statements. As an initial matter, we review these challenges for plain error because Jeune never objected to the government's reference to her prior conviction in its opening and closing statements. *United States v. Deason*, 965 F.3d 1252, 1265 (11th Cir. 2020). [Doc. 109 at 8-20 (Gov't Opening Statements); doc. 113 at 133 (Gov't Closing Statement).] "For the admission of evidence to constitute plain error, the evidence must have been so obviously inadmissible and prejudicial that, despite defense counsel's failure to object, the district court, *sua sponte*, should have excluded the evidence." *United States v. Williams*, 527 F.3d 1235, 1247 (11th Cir. 2008) (citation and internal quotation marks omitted). That standard is not satisfied here.

In explaining why that is so, we begin by noting that, in light of the district court's pretrial ruling on the government's motion *in limine*, nothing precluded the government from discussing the facts of Jeune's 2009 conviction and the supervised release that followed, in its opening statement. The government was also within its rights to refer to the 2009 conviction and alleged violation of supervised release in its closing, provided it did so within the bounds of the court's Rule 404(b) ruling.

But the government's four references to Jeune's having gone "back" to committing tax fraud were simply impermissible under Rule 404(b). For example,

in its opening, the government urged, "When she came out of prison, *she went back to what she knew best,* committing more tax fraud but this time it was different."

This is a clear propensity argument—which, by its express terms, Rule 404(b) does not allow. The government must do better. As the Supreme Court explained nearly a century ago, "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). For this reason, the Court has cautioned that the prosecutor "is in a peculiar and very definite sense the servant of the law . . . . He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones." Thus, the Court has opined, "It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id.*

Despite our disappointment with this aspect of the government's trial presentation, we find no basis to conclude plain error occurred here and to reverse on this record. This is so for several reasons.

First, opening and closing "statements and arguments of counsel are not evidence." *United States v. Smith,* 918 F.2d 1551, 1562 (11th Cir. 1990).

26

Second, the district court here reminded the jury on three occasions that statements made during openings and closings are "not evidence. . . .  The only evidence [is] the witnesses' answers to . . . questions."  As we have noted, we generally presume juries follow the judge's instructions.  *Weeks*, 528 U.S. at 234.  And there's nothing in the record here to overcome the "rock solid" presumption that juries follow instructions.  *See In re Price,* 964 F.3d at 1049.

Third, although impermissible statements in openings and closings may, in some cases, provide an appropriate basis for vacating a conviction, this is not, as the Dissent suggests, one of those cases.  The brief impermissible statement here was repeated on four occasions over the course of a five-day trial involving hundreds of trial exhibits and the testimony of sixteen witnesses.

There is also no precedent from the Supreme Court or this Court, or the explicit language of a statute or rule, that directly resolves the issue. *United States v. Innocent*, 977 F.3d 1077, 1084-85 (11th Cir. 2020).[6]  For all these reasons, Jeune has not established plain error.

---

[6] The Dissent relies on *United States v. Dothard*, 666 F.2d 498, 505 (11th Cir. 1982), as support for reversing a conviction based on a prosecutor's closing statements accusing the defendant of a "bad character" and "act[ing] in conformity therewith in perpetrating the charged offense."  But there, we found that the danger of undue prejudice outweighed the probative value of the 404(b) evidence because (1) there were multiple instances of unnecessarily cumulative evidence presented at trial; (2) the three prior acts mentioned were unsupported by the record; (3) the prior acts were in no way related to the charged offense of making a false statement of material fact to a U.S. agency; and (4) the government still used that evidence as textbook bad-character evidence by encouraging the jury "to believe that [the defendant was] not going to tell the truth about a prior conviction or tell the truth under oath in this courtroom." *Id.* at 505.

2.    Sufficiency of Evidence to Convict

Jeune also challenges the sufficiency of the evidence supporting her conviction. We review *de novo* the sufficiency of the evidence and the denial of a Rule 29 motion for judgment of acquittal, viewing the evidence and drawing all reasonable inferences and credibility determinations in the light most favorable to the guilty verdict. *United States v. Chafin*, 808 F.3d 1263, 1268 (11th Cir. 2015). We "will not overturn [the] conviction[s] on the grounds of insufficient evidence unless no rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." *United States v. Wright,* 392 F.3d 1269, 1273 (11th Cir. 2004) (internal quotation marks omitted).

a. *Count 1, Conspiracy to Defraud the Government, 18 U.S.C. §286*

To support a conviction for a conspiracy to defraud the United States by filing false tax returns, the government had to prove "the existence of an agreement to achieve an unlawful objective, the defendant's knowing and voluntary participation in the conspiracy, and the commission of an overt act in furtherance of it." *United States v. Baldwin*, 774 F.3d 711, 721 (11th Cir. 2014). "Conspiracy may be proven by circumstantial evidence and the extent of participation in the conspiracy or extent of knowledge of details in the conspiracy does not matter if the proof shows the defendant[s] knew the essential objective of the conspiracy." *United States v. Gupta,* 463 F.3d 1182, 1194 (11th Cir. 2006) (citation and internal quotation marks omitted).

Jeune argues that the government failed to prove her affirmative agreement to participate in a tax-fraud conspiracy and, at most, it established that she merely associated with people who happened to be members of a conspiracy. She contends that the government relied on irrelevant conduct that pre-dates the dates of the conspiracy, which it alleged occurred between 2011 and 2016. Jeune also points out that phone calls to Drake Software's support line were made and tax returns were filed under Jeune's name while she was incarcerated, which she asserts proves that others at Investment Equity could commit tax fraud without her.

29

But ample evidence in the record supports Jeune's conspiracy conviction. Jeune admitted to several leadership roles and titles at Investment Equity, the entity at the heart of the conspiracy charge. And while Jeune notes that tax returns were not filed in her name as the preparer, Jeune's prior conviction precluded that. But that did not stop Jeune from reinstating her business a week before she was sentenced in the 2009 case. And the fact the EFINs Investment Equity used after that were in the names of Jeune's inner circle of friends and family provides circumstantial evidence that Jeune was still managing Investment Equity and preparing and electronically filing tax returns.

After all, the evidence also showed that at least some of the people in whose names the EFINs were listed—such as Voltaire—did not even know how to prepare a tax return. So clearly, someone else was using his EFIN. And Jeune admitted to improperly using her ex-husband's and then-boyfriend's EFINs, and she contacted the IRS on multiple occasions to reinstate the EFINs after they were terminated in 2012 for misuse. The following year, an EFIN associated with Jeune's son Jacob transmitted approximately 130 tax returns to IRS.

In addition, Jeune's ex-husband Voltaire stated under oath that Jeune directed him to lie to IRS civil auditors about his involvement at Investment Equity, even though he testified that he did not know how to prepare taxes and that he had never

prepared taxes.  And Voltaire's EFIN was used to submit several tax returns for the years 2011 and 2012, according to several witnesses and tax-return exhibits.

Not only that, but Voltaire also testified that he signed a false affidavit dated February 8, 2012, that Jeune had prepared and submitted to Auditor Schmergel.  He explained that he did so to "protect" his ex-wife.  Jeune also falsely told Schmergel that Voltaire had prepared her taxes.  And she admitted to Schmergel that she had prepared about fifty tax returns while she was on supervised release and prohibited from doing so.  These returns were prepared during the period of the charged conspiracy.

Besides this, Jeune, her uncle Meronne, and her ex-husband Voltaire were listed as having signatory authority over Investment Equity's SunTrust bank accounts.  IRS tax refunds were improperly being electronically deposited in full into these bank accounts.  Typically, the IRS submits refunds directly into the taxpayer's personal bank account or sends a check to the taxpayer's mailing address.  But if a taxpayer and tax preparer agree that a portion of the tax refund must be set aside for preparer fees, then the tax return submitted to the IRS must indicate such an agreement for a *portion* of the refund be deposited into the tax preparer's bank account.  Shortly after full tax refunds were deposited into Investment Equity's SunTrust bank accounts, checks with Jeune's signature were written out to pay for

31

Jeune's personal expenses, including payments to car dealerships, a hair salon, a clothing boutique, her restaurant, and her children's private school.

Witness testimony at trial, which included taxpayer victims who were clients at Investment Equity, also placed Jeune in the conspiracy. Peaches Davis, for example, stated that even though Jeune's sister Dorothy was listed as the tax preparer on tax returns, Peaches met with Jeune for tax preparation, which resulted in falsified filings on her 2012, 2013, and 2014 tax returns.

Similarly, Lennox Griffith, Sr., testified that he spoke with Jeune regarding his 2011 tax return for over an hour and provided her with relevant documentation to prepare his returns. He verified that his 2011 tax return included a falsified home address, a fake W-2 from Walmart claiming $43,000 in wages, and a claim for a $6,500 tax refund that he never received.

And Nicholas Davis testified that when he was a college student and needed his parents' 2012 tax returns for financial-aid purposes, he spoke with Jeune directly for copies of the returns because he knew that Jeune filed taxes for his parents.

Similarly, Sabrina Mauricette testified that a 2011 tax return filed under her name and Social Security number included a fake W-2 form falsely claiming employment at Nickourts International; an incorrect home address listed in Austin, Texas; and a false statement that she was married to someone named Joseph Benjamin. Jeune was listed as the paid tax preparer on this form.

32

This evidence was sufficient to allow the jury to reasonably find that Jeune knowingly and willfully agreed with others in her inner circle to submit false tax returns—even if others continued the practice while she was in prison. *Baldwin*, 774 F.3d at 721-22 (finding that "other evidence presented at trial clearly was sufficient to link [defendant] to the scheme and to convict [him]" even when there was "no testimony that [defendant] personally filed a fraudulent return").

### b. *Count 4, Filing False Tax Returns, 18 U.S.C. § 287*

Next, we turn to Count 4. Count 4 charged Jeune with filing a false 2013 individual income tax return on behalf of taxpayer Nicholas Davis, in violation of 18 U.S.C. § 287. Section 287 prohibits (1) making or presenting a false, fictitious, or fraudulent claim to a department or agency of the United States; (2) while knowing the claim was false, fictitious, or fraudulent; and (3) making the claim "with the specific intent to violate the law or with a consciousness that what he was doing was wrong." *United States v. Slocum,* 708 F.2d 587, 596 (11th Cir. 1983). Because Jeune was charged with aiding and abetting, the government had the option of proving the offense by showing another person made the false claim, but Jeune joined as a willful participant. *See United States v. Cook,* 586 F.2d 572, 575 (5th Cir. 1978) (noting that an individual can be convicted as a principal even though the evidence establishes that she has only aided and abetted).

The count arises from a false tax return submitted on behalf of Nicholas Davis for the 2013 tax year, seeking a refund in the amount of $1,735. Nicholas could not testify as to who filed his false tax form, meaning there was no direct proof that Jeune filed the tax return for him. He explained that while he dropped off the tax paperwork for his parents, Peaches and Cornell Davis, with Jeune's sister, Dorothy, at Investment Equity, he believed Jeune prepared the taxes.

The 2013 tax return also indicated that Jeune's son Jacob was the tax preparer under the firm name Jacob Jeune, P.A., which was located at the same address as Investment Equity. But Nicholas, who was pursuing music fulltime, testified that he knew Jacob from the music scene only and not for his tax-preparation acumen.

The 2013 Form 1040 filed under Nicholas Davis's name included a falsified W-2 from Nickourts International and fraudulent tax deductions, such as a false business expense for an automobile valued at $7,577 and a $2,000 donation to charity. He testified that he never received the refund of $1,735 that was claimed on the return. He learned about the falsified tax return when he tried to file his actual W-2 from earnings at Price Mart, Inc. for $3,477. After getting a delayed refund, he contacted the IRS and was informed of his duplicative 2013 tax returns and that he had to validate his return to determine the real one.

Circumstantial evidence supports the government's assertion that Jeune used her son Jacob's name to file Nicholas's 2013 fraudulent tax return. After the IRS

34

revoked the EFINs in Voltaire's name on February 3, 2012, and in Gordon's name on September 7, 2012, Jeune had to find another way to obtain an EFIN if she was going to continue ghost-preparing tax returns. A reasonable jury could conclude that she used her son Jacob for that purpose. Indeed, as with the EFINs used for Voltaire and Gordon, over 100 tax returns were submitted to the IRS in 2013 under Jacob's name and EFIN. And while several tax returns also listed an unincorporated firm, "Jacob G. Jeune P.A.," as the tax preparer's firm, the preparer's address was still listed as Investment Equity's address in Miami.

Nicholas also testified that his 2013 tax returns listed a false home address in Hollywood, Florida. Agent Bates testified that in his experience of theft investigations, using a fake home address was one of the "main tools to ensure, number one, that [preparers] will get the refund if it doesn't get wired; [and] number two, if documents are mailed from IRS, the real taxpayer would not get alerted to that information."

Nicholas's mother Peaches also testified that she used Investment Equity and Jeune to file taxes in 2012 and claimed Nicholas as a dependent on her return. So Jeune already had access to Nicholas's personal identifying information from which to prepare the fraudulent 2013 tax return charged in the indictment for Count 4.

Finally, the jury also reasonably could have considered all the other evidence relating to the conspiracy and the other counts in evaluating the evidence pertaining

35

to Nicholas's 2013 tax return. *Cook,* 586 F.2d at 575. In short, we conclude that sufficient evidence supported the jury's verdict on Count 4.

### c. *Counts 6, 8, 10 – Assisting in Preparation of False Tax Returns, 26 U.S.C. § 7206(2)*

Counts 6, 8, and 10 charged that Jeune knowingly and willfully assisted and advised in the preparation of tax returns with materially false statements. 26 U.S.C. § 7206(2). The three counts pertained to the individual tax returns of Peaches Davis for the years 2012, 2013, and 2014, respectively.

Jeune urges that Peaches Davis, whose tax returns between 2012 and 2014 served as the basis for these counts, could not definitively establish that she hired Jeune to prepare her taxes. And that is true. Although Peaches claimed that she hired Jeune to prepare her tax returns, Peaches was not entirely familiar with the "inner workings" of Investment Equity because most of her interaction consisted of "dropping [off tax] materials at the office." Peaches also admitted that she had a personal friendship with Jeune's sister Dorothy, whose name appears as the "tax preparer" on one of the three falsified tax returns in question.

On the other hand, Peaches did testify that Dorothy referred her to Jeune to prepare her tax returns for the 2012, 2013, and 2014 tax years. And she stated that she hired Jeune and personally observed Jeune working on tax returns over the three-year period. Peaches further testified that she did not provide Jeune with the false information ultimately included on her returns. In addition, Peaches explained that

36

she personally dropped off her tax documents to Jeune, who sat at the back of the Investment Equity office.  Not only that, but Jeune was the one who called Peaches on the phone to confirm or finalize the tax returns.

As to Count 6 specifically, Peaches testified that the 2012 return claimed false business expenses and medical expenses, including $7,057 in employee business expenses, $6,051 in vehicle expenses, and $10,800 in medical and dental expenses. For Count 8, Peaches testified that the 2013 return falsely claimed $976 in wages from "Randstad Professionals," an entity at which Peaches never worked.  For Count 10, Peaches stated that her 2014 return claimed $34,004 in false unreimbursed employee expenses.  Peaches's testimony was similar to that of other witnesses, who testified that their tax returns filed between 2011 and 2016 likewise included falsified W-2s and inflated business or medical expenses for tax deductions.

Finally, we note that for a conviction under 26 U.S.C. § 7206(2), the defendant does not need "to sign or prepare the return" to be prosecuted under this statute. *United States v. Wolfson,* 573 F.2d 216, 225 (5th Cir. 1978).  So the fact that Dorothy and Jacob were listed as "tax preparers" on Peaches's 2012, 2013, and 2014 tax returns does not preclude Jeune's conviction on these charges.

The "jury [was] free to choose among reasonable constructions of the evidence." *United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir. 1983) (quotation marks omitted).  And based on the evidence here, a jury reasonably could have

37

inferred that Jeune knowingly and willfully assisted in preparing all Peaches's false tax returns charged.  Indeed, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Young*, 906 F.2d 615, 618 (11th Cir. 1990).  Viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict, we affirm Jeune's convictions. *United States v. Taylor,* 480 F.3d 1025, 1026 (11th Cir. 2007).

## B.    Restitution Amount Challenge

The Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A (2000), requires a defendant convicted of fraud, like Jeune, to pay restitution to victims of the offense. 18 U.S.C. § 3663A(c).  The restitution owed to the victim must be an "amount of loss actually caused by the defendant's conduct." *United States v. Foster,* 878 F.3d 1297, 1307 (11th Cir. 2018) (quotation marks and citation omitted).  The government must first establish the amount of restitution by a preponderance of the evidence. *Baldwin*, 774 F.3d at 728 (citation omitted); *see also* 18 U.S.C. § 3664(e) ("Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence.")  Since calculating restitution amounts can be "an inexact science," a district court need only

38

make a "reasonable estimate of the loss" based on the available information. *United States v. Futrell*, 209 F.3d 1286, 1292 (11th Cir. 2000) (citation and quotation marks omitted).

At the restitution hearing, the government submitted its trial exhibit of a summary chart listing 125 tax returns associated with Jeune's businesses. Using records collected and subpoenaed during the IRS civil investigation, IRS Auditor Schmergel prepared the summary chart, which purported to account for the tax loss relating to false withholding, public theft of money, and false material items on tax returns. She tracked down the information and organized it by the taxpayers' first and last names, Social Security numbers, reported employers and wages, and the tax preparer's EFIN. Schmergel calculated $398,021 as the total intended IRS loss from the claimed tax refunds attributable to false wage and withholding claims.

Jeune countered that the restitution amount owed to the IRS was $199,971. The district court overruled Jeune's objections and determined that the trial evidence supported the government's restitution calculation. Accordingly, the district court ordered Jeune to pay $398,021 in restitution owed to the IRS.

On appeal, in challenging the restitution amount, Jeune raises two new challenges that she did not present to the district court. Normally, we review factual findings about the specific restitution amount for clear error. *United States v. Bane*, 720 F.3d 818, 824 (11th Cir. 2013). But because Jeune didn't raise these objections

in the district court, we review them now for plain error. *See Deason,* 965 F.3d at 1265.

Under plain-error review, the defendant bears the burden to establish (1) an error that she did not intentionally relinquish or abandon, (2) that is plain, and (3) that affects the defendant's substantial rights. *United States v. Hawkins,* 934 F.3d 1251, 1264 (11th Cir. 2019).  If all three conditions are met, we may exercise our discretion to notice and correct a forfeited error, "but only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Hernandez*, 906 F.3d 1367, 1370 (11th Cir. 2018) (citation and quotation marks omitted).

Jeune first argues that the total restitution amount does not account for whether taxpayers repaid the IRS any refunds obtained through fraudulent tax returns.  She also notes that at least 50 of the 125 transactions in the summary chart indicate full issuance directly to the taxpayers' pre-paid debit accounts.  Jeune asserts that the IRS will eventually require that these taxpayers repay the full refunds in the future, which will reduce the IRS's actual loss.

But the problem with Jeune's argument is that loss is "measured from the perspective of the victim," in this case the IRS.  *United States v. Machado*, 333 F.3d 1225, 1228 (11th Cir. 2003).  And other than a mere hope of a repayment, Jeune has not pointed to any evidence that she or other taxpayers have returned or will return

money to the IRS.  *United States v. Campbell,* 765 F.3d 1291, 1302 (11th Cir. 2014);

18 U.S.C. § 3664(e) ("Any dispute as to the proper amount or type of restitution

shall be resolved by the court by the preponderance of the evidence.").

Second, Jeune argues that the restitution award does not account for individual

participation in the conspiracy by others, such as Voltaire, Gordon, Jacob, and

Dorothy.  But even when the district court finds that more than one defendant

contributed to the victim's loss, the court in its discretionary authority "*may* make

each defendant liable for payment of the full amount of restitution or *may* apportion

liability among the defendants to reflect the level of contribution to the victim's loss

and economic circumstances of each defendant."  *Baldwin,* 774 F.3d at 729 (quoting

18 U.S.C. § 3664(h) (emphasis added)).  As we have explained, Jeune's involvement

in the scheme here was substantial, and the district court was entitled to hold her

accountable for the entire restitution amount.  *Id*.

We find no error.  But even if we did, in the Eleventh Circuit, error cannot be

plain in the absence of a Supreme Court or Eleventh Circuit precedent on point.

*Schultz*, 565 F.3d at 1357.  Here, none supports Jeune's arguments.  Because we find

no plain error that is "obvious" or "clear under current law," Jeune's argument as to

the restitution amount fails.  *United States v. Humphrey,* 164 F.3d 585, 588 (11th

Cir. 1999).

41

C.    Sentence Challenges

Finally, we consider Jeune's sentencing challenges.  Here, the district court determined that Jeune's total adjusted offense level was 34, and her criminal-history category was III, yielding a guideline range of 188 to 235 months' imprisonment. As we have noted, Jeune was sentenced to a total of 180 months' imprisonment.

We review a district court's interpretation and application of the Sentencing Guidelines *de novo*, and we review its findings of fact for clear error. *United States v. Perez*, 943 F.3d 1329, 1332-33 (11th Cir. 2019).  "Clear-error review is deferential," meaning "we will not disturb a district court's findings unless we are left with a definite and firm conviction that a mistake has been committed." *United States v. Ghertler,* 605 F.3d 1256, 1267 (11th Cir. 2010) (quotations omitted) Sentencing arguments raised for the first time on appeal are reviewed for plain error. *United States v. Haynes,* 764 F.3d 1304, 1308 (11th Cir. 2014).

Jeune asserts that her sentence is procedurally and substantively unreasonable. Our review of the reasonableness of a sentence requires us to undertake a two-step process.  *United States v. Fox*, 926 F.3d 1275, 1278 (11th Cir. 2019).  At the first step, we review the sentence for procedural reasonableness to ensure a correct calculation and application of the Sentencing Guidelines.  *Id.*  If we conclude that the sentence is procedurally reasonable, we move onto the second step and evaluate

whether the sentence is substantively reasonable, considering the totality of the circumstances and the factors set forth at 18 U.S.C. § 3553(a). *Id.*

Jeune raises five procedural-reasonableness challenges: (1) she contends that the district court used the incorrect loss amount, causing it to add too high an enhancement for loss; (2) she asserts that the unauthorized-access-device enhancement was not applicable here; (3) she argues that the district court attributed too great a role to her; (4) she urges that the district court should not have applied the abuse-of-trust enhancement; and (5) she asks us to find the obstruction-of-justice enhancement wrongly imposed. We address each contention in turn. Because we conclude that the district court erred in imposing the obstruction-of-justice enhancement, we must vacate the sentence and do not reach the substantive-unreasonableness argument. *United States v. Barner,* 572 F.3d 1239, 1253 (11th Cir. 2009).

1.    14-point Loss-amount Enhancement

On appeal, Jeune argues that the district court's determined loss amount "lump[s] together" losses from the entire conspiracy, incorrectly pinning the full loss on her. Jeune raises this argument for the first time on appeal, so any review would be for plain error.

But the government responds that we should not address this argument on appeal because in the district court, the parties agreed that "the amount of loss is

43

more than $550,000 but not more than [$]1.5 million." So if any error occurred, the government asserts, Jeune invited it. And under the invited-error doctrine, we do not review any error when a party has induced the district court into making the alleged error challenged on appeal. *United States v. Silvestri*, 409 F.3d 1311, 1327-28 (11th Cir. 2005).

We agree with the government. Any error here was invited. But we note that we see no error, in any case. Jeune was the key actor in the tax-fraud conspiracy here. She owned the tax-preparation businesses and ran its daily operations, her inner circle of friends and family directed clients to her, she had control and authorization over Investment Equity bank accounts, and she openly admitted to using other employees' EFINs to electronically file tax returns. Jeune also pointed to no evidence to rebut her central role as a key actor who participated fully in the conspiracy. Nor did she identify evidence to recalculate the loss amount. For these reasons, we find no error, let alone plain error, as to the 14-point loss enhancement. *See*, *e.g.*, *Baldwin,* 774 F.3d at 730-31.

### 2.    2-point Production-of-Unauthorized-Access-Devices Enhancement

Next, Jeune challenges the unauthorized-access-device enhancement. Under § 2B1.1(b)(11)(B)(i), a defendant is subject to a two-level increase in her offense level if the offense involved the production of an unauthorized access device. U.S.S.G. § 2B1.1(b)(11)(B)(i). The commentary defines "production" to mean

"manufacture, design, alteration, authentication, duplication, or assembly." *Id.* §
2B1.1 cmt. n.10(A).  The Guidelines provide that an "unauthorized access device"
means what 18 U.S.C. § 1029(e)(3) says it means.  *See* U.S.S.G. § 2B1.1 cmt.
n.10(A).  And § 1029(e)(3) defines "unauthorized access device" to mean "any
access device that is lost, stolen, expired, revoked, canceled, or obtained with intent
to defraud."  Section 1029(e)(1), in turn, defines "access device," as relevant here,
to mean account numbers, personal identification numbers, "or other means of
account access that can be used, alone or in conjunction with another access device,
to obtain money, goods, services, or any other thing of value."   18 U.S.C. §
1029(e)(1).

We have held that "a social security number qualifies as an 'access device'
under the definition in 18 U.S.C. § 1029(e)(1) and for purposes of the Special Rules
in the Sentencing Guidelines." *United States v. Wright*, 862 F.3d 1265, 1275 (11th
Cir. 2017).  The record establishes Investment Equity's practice of duplicating
taxpayers' Social Security numbers without their knowledge on falsified tax
documents to access fraudulent refunds in their names, some of which were not
passed along to the taxpayers.  U.S.S.G. § 2B1.1 cmt. n.10(A); 18 U.S.C. §
1029(e)(1), (3).  That is sufficient to sustain this enhancement.

45

3.    4-point Enhancement for Jeune's Role in the Offense

Jeune argues that the district court erred in applying four points to her offense level for her role. The Guidelines provide for a four-level increase if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). If the defendant was not an organizer or leader but served as a manager or supervisor and the criminal activity involved at least five participants or was otherwise extensive, a three-point role enhancement is appropriate. *Id.* § 3B1.1(b). And if the defendant played any of these roles in a criminal activity that involved fewer than five participants and was not otherwise extensive, the court should increase the offense level by two points for the defendant's role. *Id.* § 3B1.1(c).

A court should consider several factors in determining role in the offense, including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices . . . , the degree of participation in planning or organizing the offense . . . , and the degree of control and authority exercised over others." *Id.* § 3B1.1, cmt. n.4.

Here, Jeune argues that the government provided no evidence of the other conspirators' roles in the scheme, so there was no evidence on which to base an enhancement of four points instead of two under § 3B1.1. Jeune also contends that

46

the government failed to establish that she was a controlling figure in the scheme because the other conspirators did not cease their activities when she was in prison.

Jeune made no written or oral objections to the role enhancement, so we review for plain error. We find no error. As we have mentioned, ample evidence at trial established Jeune's central role in Investment Equity's daily operations. Witness testimony showed that she, Voltaire (who lied for her and obtained an EFIN that he allowed her to use), Gordon (who obtained an EFIN that he allowed her to use and who was seen working at her office and under her supervision), Dorothy (who prepared returns along with her), and Chester Wright (who was seen working at Jeune's office and under her supervision) all participated in the scheme, with Jeune supervising and directing them. She also directed these employees to lie on her behalf so she could repeatedly conceal her improper use of EFINs. Not only did Jeune direct employees who came from her inner circle, but she also served in multiple capacities, such as bookkeeper, office manager, corporate agent, and vice president, at Investment Equity. *See Haynes*, 764 F.3d at 1308; U.S.S.G. § 3B1.1, cmt. nn.4-5. The district court did not plainly err in imposing this enhancement.

4.    2-point Enhancement for Abuse of Trust

Jeune argues for the first time on appeal that the district court erred in applying an abuse-of-trust enhancement because, in her view, her position as a tax preparer "did not lead to a position of trust vis-à-vis the taxpayer of the type that would

47

facilitate the commission or concealment of the crime." Once again, we review for plain error.

The Guidelines provide for an offense-level increase of two if a defendant abused a position of public or private trust "or used a special skill" in a manner that significantly facilitated the commission or concealment of the offense. U.S.S.G. § 3B1.3. For that adjustment to apply, the government must establish that (1) the defendant held a position of "private or public trust"; (2) the defendant "abused that position in a way that significantly facilitated the commission or concealment of the offense"; and (3) the victim "conferred the trust." *United States v. Walker,* 490 F.3d 1282, 1300 (11th Cir. 2007). A position of public or private trust refers to a position "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)," and persons holding such positions "ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." U.S.S.G. § 3B1.3 cmt. n.1.

The district court did not plainly err in applying this enhancement. Jeune had clients who were specifically referred to her for tax-preparation services. As evidenced by witnesses like Peaches Davis and Lennox Griffith, Jeune's clients entrusted Jeune to use her tax-preparation expertise to accurately prepare their tax returns and, if appropriate, to obtain refunds for them. Jeune used that trust to file

48

fraudulent tax returns and to obtain fraudulent refunds that, in some cases, she kept substantial parts of for herself, also without advising her clients. As a result, some of her clients found themselves with IRS identity-theft flags and holds on their refunds. For these reasons, the district court properly applied the abuse-of-trust enhancement here.

5.    2-point Enhancement for Obstruction of Justice

Finally, Jeune challenges the district court's application of the two-point enhancement for obstruction of justice. The Guidelines provide for a two-level increase if (1) a defendant "willfully obstructed or impeded, or attempted to obstruct or impede" justice regarding the instant offense's "investigation, prosecution, or sentencing"; and (2) the obstructive conduct related to the defendant's "offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1. "Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered . . . if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." *Id.* § 3C1.1 cmt. n.1.

Jeune argues that the false affidavit she provided to the IRS during its civil investigation of Investment Equity cannot be a proper basis for the obstruction-of-justice enhancement, since the audit related to the business's delinquent corporate returns for the 2009 and 2010 tax years, not the criminal conduct that the indictment charged occurred between January 2011 and October 2016. If anything, Jeune urges,

her false statements made under penalty of perjury in her affidavit only led to the criminal investigation—not impeded it.  Jeune raised this argument before the district court, so we now review for clear error.  *United States v. Patti*, 337 F.3d 1317, 1324 (11th Cir. 2003).

We agree with Jeune.  At the time Jeune provided her false affidavit to the IRS civil auditors, the IRS criminal investigation does not appear to have been contemplated yet.  True, that in and of itself is not necessarily a reason to rule out the possibility that the enhancement may apply.  Even though the text of § 3C1.1 clearly requires that the perjury occur during the course of the criminal investigation, the Guidelines' commentary provides that any obstructive conduct can occur before the start of instant offense's criminal investigation.  *United States v. Wayerski*, 624 F.3d 1342, 1352 (11th Cir. 2010).

Nevertheless, as our precedent demonstrates, they must still obstruct the forthcoming criminal investigation in some way.  In *Shriver*, for example, the defendant made false statements but did not make them under oath to an IRS inspector. *United States v. Shriver*, 967 F.2d 572, 575 (11th Cir. 1992).  We reversed the district court's application of the obstruction-of-justice enhancement because the false statements did not significantly obstruct an official investigation, and the government failed to "present evidence establishing that the investigation had been in any way hindered." *Id.*

50

Similarly, the government did not show that Jeune's fraudulent statements during the IRS's civil audit impeded the criminal investigation. To the contrary, it spurred the criminal investigation. Auditor Schmergel, who was initially unaware of Jeune's convicted-felon status, had no reason to suspect that Jeune could not electronically file taxes with the IRS.[7] Her suspicions of criminal activity arose after she informed Jeune and Voltaire of the criminal consequences of perjury. Nevertheless, the civil investigation continued for several months after Jeune submitted her falsified affidavit, and Schmergel reached out to the IRS criminal investigation division only after she completed the civil audit. So Jeune's actions were the impetus of the criminal investigation, not the impediment.

In short, the government did not establish, as a matter of fact, that Jeune significantly obstructed the official criminal investigation. *Id.* For this reason, imposition of the enhancement was error, and we must vacate the sentence and remand for resentencing.

---

[7] Schmergel did not become aware of Jeune's prior conviction until February 10, 2012, when she performed a simple Google search on Jeune and found a Department of Justice press release about her 2009 conviction. Schmergel also explained that the IRS criminal division never spoke to her about the 2009 conviction because the IRS civil and criminal divisions are separate entities with separate databases. And having a civil auditor work directly with a criminal investigator would have violated IRS policy to independently further an investigation.

## III.  CONCLUSION

We affirm the judgment of conviction and restitution amount imposed. However, we vacate the sentence and remand for resentencing.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

MARTIN, Circuit Judge, dissenting:

The government began the presentation of its 2019 tax fraud case against Tamara Jeune by telling the jury that, after she was convicted of committing a different tax fraud in 2009, she "came out of prison [and] went back to what she knew best." It then closed its presentation by telling the jury that, after her 2009 fraud conviction, Ms. Jeune went "right back to her fraud factory." Even in isolation, these statements constitute improper propensity evidence. Yet in Ms. Jeune's prosecution, these statements were mere bookends for her trial, which was filled with improper propensity-based and prejudicial evidence and statements concerning her earlier crime.

Federal Rule of Evidence 404(b) governs the admissibility of evidence of a person's past wrongs. Rule 404(b) is intended to protect those accused of a crime from being convicted based on the idea that the accused has done bad things in the past, so they must have therefore done this bad thing as well. At the same time, and as the majority opinion points out, the rule allows evidence of past crimes to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). But once a court allows this type of evidence for the limited purpose permitted by the rule, the government can, and often does, go ahead and violate the rule's prohibition on using past crimes to show that the defendant "acted in accordance" with that past conduct.

53

Fed. R. Evid. 404(b)(1).  In my view, the government violated the prohibition of

Rule 404(b) in Ms. Jeune's case.  Because of this violation, I would reverse Ms.

Jeune's convictions.[1]

## I

I begin by setting out the specific government misconduct that fuels my

dissent.  Among the very first words the jury heard from the government in its

opening statement were the following:

> In February of 2009, this defendant stood in a courtroom
> just like this courtroom, and she stood in front of a Judge,
> just like this Judge, and she admitted, under oath, that she
> had prepared false tax returns. . . . [T]he reason why we
> are here today is a continuation of what the defendant
> admitted back then because one thing is going to be very
> clear, ladies and gentlemen, this defendant did not stop
> stealing taxpayer money. . . . When she came out of
> prison, she went back to what she knew best, committing
> more tax fraud . . . .

Minutes later, the government repeated its propensity-based assertion that "[a]fter

[Ms. Jeune] went to prison, she went back to doing the same thing."  And then

again, the government told the jury that after her 2009 conviction, Ms. Jeune "went

back to what she knew best."

The government introduced Ms. Jeune's 2009 conviction through Andrew

Schmit, the former IRS agent who investigated Jeune's conduct underlying that

---

[1] Because I would reverse Ms. Jeune's convictions on this ground, I would not reach the other issues raised in her appeal.

conviction.  The government did not limit Mr. Schmit's testimony to only Ms. Jeune's 2009 conviction and facts relevant to her "motive, opportunity, intent, preparation," etc. related to the 2019 case.  Rather, the government painstakingly took Mr. Schmit through the details of Ms. Jeune's 2009 case.  Mr. Schmit's testimony went almost line-by-line through partly redacted transcripts of Ms. Jeune's previous plea hearing and sentencing.

These actions by the government exposed the jury to irrelevant and prejudicial facts regarding Ms. Jeune's 2009 conviction.  Although the District Court's ruling on this topic allowed the government to tell the jury about Ms. Jeune's conviction for one count of tax fraud, the government read to the jury from the plea hearing transcript that she was originally charged with 30 counts of tax fraud.  Then from the 2009 sentencing transcript, the government quoted Ms. Jeune's "pray[er]" for "favor and mercy" from the court.  And the government told the jury that Ms. Jeune's sentence for her 2009 conviction was 18 months.

The government closed its case largely the same way it opened.  The government told the jury that after Ms. Jeune was released from prison for the 2009 conviction, she went "right back to her fraud factory, her tax preparation business."  The government also argued Ms. Jeune conspired with her sister to commit tax fraud in this case because Jeune "admitted she had conspired with [her sister] to commit tax preparation fraud in 2009," "which led to that conviction."

55

## II

On this record, the government improperly used Ms. Jeune's 2009 conviction, and the resulting error was not harmless. I address these two points in order.

## A

In ruling on the government's motion under Rule 404(b), the District Court allowed the government to place Ms. Jeune's 2009 conviction into evidence. Under this rule, "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Yet on the other hand, evidence of prior bad acts "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). In short, "Rule 404(b) prohibits the introduction of pure propensity evidence." United States v. Covington, 565 F.3d 1336, 1341 (11th Cir. 2009).

This Court has a three-prong test for the admissibility of evidence under Rule 404(b): (1) the evidence must be "relevant to an issue other than the defendant's character"; (2) the prior act must be "proved sufficiently to permit a jury determination the defendant committed the act"; and (3) "the evidence's probative value cannot be substantially outweighed by its undue prejudice, and it

must satisfy Federal Rule of Evidence 403." United States v. Eckhardt, 466 F.3d 938, 946 (11th Cir. 2006). My review of the government's various uses of Ms. Jeune's 2009 conviction tells me that many of their references were irrelevant to any issue other than her character and that they were unduly prejudicial. Thus the government's justification for what it did flunks the first and third requirements established by our Court.

I start with the first requirement. The majority opinion holds that the details of Ms. Jeune's 2009 conviction and sentence, which were introduced by the government through Mr. Schmit, were relevant for issues other than her character, including her intent, identity, knowledge, and absence of mistake. Maj. Op. at 17–19. I have no quarrel with the idea that some of the uses the government made of Ms. Jeune's 2009 conviction came within the bounds of the rules. I therefore agree with the majority that the government was not limited to introducing only the prior judgment of conviction. But in other instances, the government went too far. In particular, I take issue with the fact that the government noted Ms. Jeune was originally charged with 30 counts of tax fraud, quoted Jeune's "pray[er]" for "favor and mercy," and revealed Jeune's sentence of 18 months' imprisonment.

That Ms. Jeune was initially charged with 30 counts of fraud, her 2009 colloquy with the court at her sentencing, and the length of her sentence were simply not relevant to issues other than her character. See Eckhardt, 466 F.3d at

57

946. Indeed, with respect to Ms. Jeune's "pray[er]" for "mercy," and during oral argument in our Court, the government expressly "acknowledge[d] that was not necessary" to its case. The government plainly used the prejudicial details of the 30 counts of fraud, Ms. Jeune's expressed need for "mercy" on account of her prior fraud, and the length of the sentence imposed on her in 2009 to support its argument that Jeune committed fraud again in the 2019 case. These facts were "pure propensity evidence." Covington, 565 F.3d at 1341.

The government's opening and closing statements also violated the prohibition against using Ms. Jeune's prior conviction as character evidence. For starters, the government repeatedly stated that after leaving prison for the 2009 fraud conviction, Ms. Jeune went "back to" committing fraud. By my count, the government made this statement at least four times. See Doc. 109: 9 ("When she came out of prison, she went back to what she knew best, committing more tax fraud . . . ."); id. at 11 ("After she went to prison, she went back to doing the same thing."); id. at 12 ("Now, when she came out of prison, as I mentioned, she went back to what she knew best."); Doc. 113: 188 ("She [went] right back to her fraud factory, her tax preparation business."). Likewise, the government argued in closing that Ms. Jeune conspired with her sister to commit tax fraud in this case because Jeune "admitted she had conspired with [her sister] to commit tax preparation fraud in 2009," "which led to that conviction."

58

These statements plainly relate to Ms. Jeune's character.  See Eckhardt, 466 F.3d at 946.  Tellingly, at oral argument, the government acknowledged that it was "not necessary" to its case to say Ms. Jeune went "back to" committing fraud.  This record reflects no other reason for the government to say Ms. Jeune went "back to" committing fraud after her prior fraud conviction except to support the argument that she should be convicted of fraud in this case because she committed fraud before.  I agree with the majority that these remarks were a "clear propensity argument" and were "simply impermissible."  Maj. Op. at 25.  Well said.

As for the third requirement, there is no question under our precedent that the facts underlying the 2009 conviction and the government's statements in opening and closing were unduly prejudicial to Ms. Jeune.  "Extrinsic evidence of other crimes, wrongs, or acts is inherently prejudicial to the defendant."  United States v. Sterling, 738 F.3d 228, 238 (11th Cir. 2013) (quotation marks omitted).  This is because when faced with such evidence, "the jury may convict the defendant not for the offense charged but for the extrinsic offense."  United States v. Beechum, 582 F.2d 898, 914 (5th Cir. 1978); see also United States v. Myers, 550 F.2d 1036, 1044 (5th Cir. 1977) ("A concomitant of the presumption of innocence is that a defendant must be tried for what he did, not for who he is.  The reason for this rule is that it is likely that the defendant will be seriously prejudiced

59

by the admission of evidence indicating that he has committed other crimes.").[2]  I easily conclude that the undue prejudice of the government's extensive discussion and characterization of Ms. Jeune's 2009 crime substantially outweighed any probative value it offered.  See Eckhardt, 466 F.3d at 946.

**B**

Although the majority and I join forces to condemn some of the government's actions here, I cannot agree with the majority's conclusion that there is "no basis . . . to reverse on this record."  Maj. Op. at 26.  I don't believe the government's misuse of Ms. Jeune's 2009 conviction was harmless error, as I think the government's misconduct prejudiced Ms. Jeune's defense.  As I've set out above, I count at least four times in its opening and closing statements when the government made its impermissible statement that after leaving prison for the 2009 fraud conviction, Ms. Jeune went "back to" committing fraud.  Beyond that, the government reinforced its propensity argument by asserting Jeune conspired with her sister to commit tax fraud in this case because Jeune "admitted she had conspired with [her sister] to commit tax preparation fraud in 2009," "which led to that conviction."  Finally, and as also set out above, I believe the government misused some facts underlying the 2009 conviction for propensity purposes: the

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209.

fact Ms. Jeune was charged with 30 counts of tax fraud, her "pray[er]" for "favor and mercy," and the length of her sentence. The government's drumbeat of propensity infected Ms. Jeune's entire trial.

The contrary arguments made by the majority as well as the government do not persuade me. First, the majority declines to reverse Ms. Jeune's convictions because "opening and closing 'statements and arguments of counsel are not evidence,'" and because the government's statements here are not "an appropriate basis for vacating [Jeune's] conviction" in light of the length of the trial and the amount of evidence. Id. But as the majority acknowledges, this would not be the first time our Court has reversed a conviction based on opening and closing statements. For example, in United States v. Dothard, 666 F.2d 498 (11th Cir. 1982), the Court reversed the defendant's conviction based on "the prosecutor's closing argument," which "constitute[d] an impermissible attempt to demonstrate the accused's bad character to prove that he acted in conformity therewith in perpetrating the charged offense." Id. at 505; see also, e.g., United States v. Marshall, 173 F.3d 1312, 1318 (11th Cir. 1999) ("[T]he potential prejudice was exacerbated by the Government's use of the prior arrest evidence in its closing argument."). In my view, the government's problematic statements, which we all agree were impermissible, coupled with the government's other propensity-based evidence, require us to reverse Ms. Jeune's convictions.

61

Second, the majority notes the District Court instructed the jury on how it should consider the 2009 conviction and whether it could consider opening and closing statements as evidence. Maj. Op. at 23, 26. The majority also says "juries follow the judge's instructions," thus suggesting that the instructions cured any error. Id. at 23–24, 26. The government makes a similar argument. To be sure, jury instructions may be useful in certain circumstances. Still, the "naive assumption that prejudicial effects can be overcome by instructions to the jury" is something "all practicing lawyers know to be unmitigated fiction." United States v. Cook, 557 F.2d 1149, 1154 (5th Cir. 1977) (addressing jury instructions in a Rule 404(b) context). This Court has a long line of precedent warning against overreliance on jury instructions to cure error. See, e.g., United States v. Elysee, 993 F.3d 1309, 1342 (11th Cir. 2021) (stating "a limiting instruction may not always sufficiently reduce the risk that the jury will misuse" evidence and that the instruction may cure "the risk of undue prejudice in limited circumstances") (quotation marks omitted); United States v. Crutchfield, 26 F.3d 1098, 1103 (11th Cir. 1994) ("[A] jury cannot always be trusted to follow instructions to disregard improper statements[.]") (quotation marks omitted); United States v. Guerrero, 650 F.2d 728, 737 (5th Cir. Unit A July 1981) (indicating that a limiting instruction might have only "possible efficacy").

It cannot be that a jury instruction cures every error.  If this is how our Court chooses to proceed, the government will have freewheeling authorization to do whatever it wants to secure a conviction, no matter how prejudicial, so long as it ensures something is said during the jury instructions to cleanse its misconduct.  I would draw the line at the government's conduct here.

Finally, the government tells us any error was harmless because there was other "[o]verwhelming evidence of guilt."  But I do not see overwhelming evidence to support Ms. Jeune's convictions.  For one thing, the District Court itself acquitted Ms. Jeune on <u>half</u> of the charges in the indictment at the close of the government's case.  Surely this is one indication that the government's case against Ms. Jeune had some problems.  In fact, much of the government's case against Ms. Jeune was based on circumstantial evidence.  Notably, the government admitted in the District Court there was little evidence that Ms. Jeune was the one who committed the fraud, because her name was "not on the paperwork" and she supposedly "hid her identity to avoid detection . . . behind other people."  In other cases this Court has held that a Rule 404(b) error was not harmless where a prosecution was built on circumstantial evidence.  See, e.g., <u>United States v. Utter</u>, 97 F.3d 509, 513–15 (11th Cir. 1996); <u>Aetna Cas. & Sur. Co. v. Gosdin</u>, 803 F.2d 1153, 1159–60 (11th Cir. 1986).

Ms. Jeune's case offers one quick example. Ms. Jeune was convicted of Count 4, which the majority acknowledges was based on circumstantial evidence. Maj. Op. at 33. Count 4 charged Ms. Jeune with filing a false 2013 individual income tax return on behalf of taxpayer Nicholas Davis. There was "no direct proof" Ms. Jeune filed Mr. Davis's tax return. Id. Neither was Ms. Jeune listed as the preparer on the return. Mr. Davis, who testified at trial, said he handed his tax paperwork to Ms. Jeune's sister, and when dropping off his paperwork, he only ever saw her sister and a man. Mr. Davis did not "stick around to see what happened with the paperwork." The lack of evidence implicating Ms. Jeune in the preparation and filing of Mr. Davis's return is an example of the weaknesses in the government's case against her. This supports my conclusion that the government's misconduct was not harmless.

But I have a more serious concern with the government's representation to this Court that any error was harmless because there was "[o]verwhelming evidence of guilt." Namely, the government made the exact opposite representation to the District Court. During the hearing on the government's motion in limine to admit Ms. Jeune's 2009 conviction, the government told the District Court that "while there is overwhelming evidence of fraud in this case," "what is not overwhelming in this case is evidence that this defendant was the one who did it." Presumably the government knows its case best, so I would hold the

64

government to the representation it made to the trial court. In other instances this Court has ruled that a Rule 404(b) error was not harmless and reversed a defendant's conviction when the government, "by its own admission in a filing with the district court, . . . did not have overwhelming evidence" of a key element of the offense. United States v. Carrasco, 381 F.3d 1237, 1241 (11th Cir. 2004) (per curiam) (quotation marks omitted). This approach would be the right one here. I would hold the government to account when it first urges the trial court to allow it to rely on problematic evidence because its case is so weak, and then arrives in our Court to say that its misuse of that evidence was harmless because its case was so strong. We can only put an end to this practice by holding the government accountable. I would do so here by reversing Ms. Jeune's conviction.

### III

In sum, the government violated Rule 404(b) by the way it used Ms. Jeune's 2009 conviction, and the error was not harmless. I would therefore reverse Ms. Jeune's convictions, and I respectfully dissent.